**DEE–K ENTERPRISES, INC.,**
**et al., Plaintiffs,**

**v.**

**HEVEAFIL SDN. BHD.,**
**et al., Defendants.**

**Civil Action No. 97–556–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 23, 1997.

Joel Davidow, Sturgis M. Sobin, Joel W. Rogers, Ablondi, Foster, Sobin & Davidow, P.C., Michael D. Hausfeld, Daniel A., Small, Paul T. Gallagher, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for plaintiffs.

Walter J. Spak, Anne D. Smith, Carolyn B. Lamm, Denise L. Diaz, Washington, DC, for defendants Heveafill Sdn. Ghd., Filmax Sdn. Bhd., Rubfil Sdn. Bhd., Rubberflex Sdn. Bhd., Fliati Lastex Sdn. Bhd.,Filati Lastes Elastofibre USA, Inc., Filati Corp. of Rhode Island, Filati Corp. of North Carolina, Rubfil USA, Inc., and P.T. Bakrie Rubber Industry.

George L. Paul, Francis A. Vasquez, Jr., White & Case, Washington, DC, for defendant JPS Elastomerics Corp.

David M. Foster, Joseph T. Small, Jr., Christine P. Hsu, Fulbright & Jaworski,

LLP, Washington, DC, for defendant JPS Elastomerics Corp.

James A. West, James A. West. P.C., Houston, TX, for defendant Consortium Intern. Corp.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this antitrust action, two American purchasers of extruded rubber thread sue various foreign manufacturers and distributors of the thread, alleging an international conspiracy to restrain trade in, and fix prices of, the thread in the United States. Defendants' several motions to dismiss raise the following threshold issues:

(1) whether there is personal jurisdiction over an Indonesian manufacturer-defendant that consummates its sales of thread in Indonesia;

(2) whether venue is proper in the Eastern District of Virginia;

(3) whether, pursuant to *Estate Construction Co. v. Miller & Smith Holding Co.*, 14 F.3d 213 (4th Cir.1994), the complaint contains sufficient facts to support an allegation of antitrust conspiracy among the distributor-defendants;

(4) whether *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) bars plaintiffs from suing defendants for a price-fixing conspiracy; and (5) whether plaintiffs have suffered any antitrust injury as a result of defendants' alleged conduct, given the Department of Commerce's determination that defendants' U.S. price for extruded rubber thread is "below fair value."

## I

According to the second amended complaint,[1] plaintiff Dee–K Enterprises, Inc. ("Dee–K") is a Virginia corporation, and plaintiff Asheboro Elastics Corporation ("Asheboro") is a North Carolina corporation. Both companies are "end users" of extruded rubber thread;[2] that is, they purchase extruded rubber thread for use in products they manufacture, rather than for resale. More specifically, plaintiffs and other end users, at the times relevant to the complaint, purchased extruded rubber thread from some of the defendants to manufacture various elasticized textiles such as hosiery and active wear, as well as other products, including children's toys and Bungee cords.

The named defendants fall into two groups. The first group consists of Malaysian, Indonesian, and Thai companies that produce extruded rubber thread. Specifically, defendants Heveafil Sdn. Bhd. ("Heveafil"), Filmax Sdn. Bhd. ("Filmax"), Rubfil Sdn. Bhd. ("Rubfil"), Rubberflex Sdn. Bhd. ("Rubberflex"), and Filati Lastex Sdn. Bhd. ("Filati Lastex") produce extruded rubber thread in Malaysia and are collectively referred to as the "Malaysian producers." Defendants PT. Bakrie Rubber Industry ("Bakrie") and PT. Perkebunan III ("Perkebunan") are the "Indonesian producers" of rubber thread; and defendants Natural Rubber Thread Co., Ltd. ("Natural Rubber Thread") and Longtex Rubber Industries Co., Ltd. ("Longtex") are the "Thai producers." Collectively, defendants and other unnamed co-conspirators

---

**1.** The original complaint in this matter was filed by plaintiff Dee–K on April 17, 1997. By Order dated July 15, 1997, the complaint was dismissed without prejudice for failure to state a claim with the specificity and factual support required by *Estate Construction Co. v. Miller & Smith*, 14 F.3d 213, 220–21 (4th Cir.1994). In the circumstances, Dee–K was given leave to amend the complaint.

Thereafter, on July 25, 1997, Dee–K and a new plaintiff, Asheboro, filed an amended complaint. Defendants responded by filing the various motions to dismiss, pursuant to Rule 12, Fed.R.Civ. P., that are the subject of this opinion. After oral argument on those motions, plaintiffs filed a motion seeking leave to file a second amended complaint. That motion was granted, and thus the analysis of the instant motions to dismiss is based on the second amended complaint.

In evaluating the several Rule 12(b) motions under consideration, the factual allegations in the second amended complaint are taken as true. *See Martin Marietta Corp. v. International Telecom. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969)).

**2.** Extruded rubber thread is vulcanized rubber thread made by forcing or drawing compounds of concentrated natural rubber latex through a die.

supply approximately eighty percent (80%) of the extruded rubber thread sold in the United States.

The foreign producers employ a variety of methods of distributing and selling their thread in the United States. One such method includes the use of separate entities that act as domestic distributors for the foreign producers; it is these entities that comprise the second group of defendants. Not all thread, however, is sold through separate distributors. Thus, Heveafil sells its product directly to end users in this country through Heveafil Sdn. Bhd. USA, Branch Inc., a division of Heveafil registered to do business in North Carolina. Filmax, a subsidiary of Heveafil and also a Malaysian producer, sells its product in the United States through Heveafil. Rubber thread from Malaysian producers Rubfil, Rubberflex, and Filati Lastex finds its way to American end users via two routes. First, the producers sell directly to their larger American customers without using an intermediary. Second, smaller customers are served via wholly owned and fully controlled American subsidiaries, namely defendants Rubfil USA, Inc. ("Rubfil USA"), Flexfil Corporation of Rhode Island ("Flexfil (RI)"), Flexfil Corporation, a North Carolina Corporation ("Flexfil (NC)"), and Filati Lastex Elastofibre USA, Inc. ("FLE–USA").

Indonesian producer Bakrie sells its product through an exclusive distributor, Globe Manufacturing Company ("Globe"), which advertises Bakrie's name and product in the United States. Globe, which is not named as a defendant, owns 25% of Bakrie, and the two companies share some common officers and directors.[3] It also appears that Bakrie executives travel to the United States at least once a year to meet with Globe officials. Perkebunan, the second Indonesian producer, uses an exclusive distributor, defendant Consortium International Corporation ("Consortium"), to sell to American end users.

Thai producer Longtex employs the services of distributor JPS Elastomerics Corporation ("JPS"), which is not a named defendant.[4] And finally, Thai producer Natural Rubber Thread uses various unidentified distributors to sell to American end users.[5]

The class action complaint alleges a conspiracy among the producers, distributors,[6] and other entities not named as defendants[7] to fix prices and to restrain competition in the sale of extruded rubber thread throughout the world, including the United States, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs seek damages and injunctive relief pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

Specifically, plaintiffs allege that the Malaysian producer-defendants first met in August 1992, along with RTI and Worldflex, and agreed (i) to raise rubber thread prices worldwide, (ii) to restrict rivalry for customers, and (iii) to discipline employees and distributors who discounted prices or otherwise violated the terms of the cartel. After 1993, the conspiracy was extended to include the

---

3. Though it is not alleged in the complaint, the parties have indicated in oral argument that Globe, as a minority owner in Bakrie, has appointed two directors to Bakrie's board.

4. JPS was a named defendant in the original complaint and in the first amended complaint, but is omitted as a defendant in the second amended complaint. Whether that omission necessitates a dismissal of JPS with prejudice, pursuant to Rule 41, Fed.R.Civ.P., or the imposition of costs, pursuant to Rule 41, or sanctions, pursuant to Rule 11, Fed.R.Civ.P., will be the subject of a separate order.

5. Throughout this opinion these eight resellers— one division of a producer, four subsidiaries, and three distributors—are collectively referred to as "distributors."

6. It is worth noting at the outset that this case does not implicate *Copperweld Corp. v. Indepen-*

*dence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). There, the Supreme Court held that a parent corporation cannot legally conspire with its wholly owned subsidiary, as the two corporations are deemed a single enterprise. *See id.* at 777, 104 S.Ct. at 2744–45. In this case, although the wholly owned distributors cannot conspire with their parent-manufacturers, they can legally conspire with other manufacturers and distributors. In other words, while the parent and subsidiary are treated as one entity under *Copperweld,* that does not preclude each such entity from conspiring to fix prices with other, unrelated entities.

7. These include Rubber Thread Industries Sdn. Bhd. ("RTI") and Worldflex Co., Ltd. ("Worldflex").

Indonesian and Thai producer-defendants, plus other unnamed Indonesian and Thai producers. The Malaysian producers then induced the Thai and Indonesian producers to coerce their own American distributors into abiding by the terms of the cartel.

On December 9–11, 1994, all the producer-defendants, plus other unnamed co-conspirators, met in Bali, Indonesia at the ASEAN Rubber Thread Manufacturers Meeting, where they again agreed to the terms of the cartel. Then, in the spring of 1995, the producers met in Panang, Malaysia to confirm the details of the conspiracy and to raise prices charged to American end users further. A copy of the meeting minutes includes references to statements by the producers that they had met in Bali the prior year to set a uniform price for rubber thread; that they should endeavor to keep prices high and uniform; but that prices should not be so high as to provide non-cartel members with sufficient incentive to enter the market.[8]

The second amended complaint also describes the distributors' role and conduct in furtherance of the conspiracy. During 1992 and 1993, various distributors, wholly owned by Malaysian producers, reported to their parents that distributors of Thai and Indonesian thread were deviating from cartel prices. The Malaysian producers conveyed this information to the Thai and Indonesian producers, who, in turn, reined in their respective distributors and induced them to raise their prices to the cartel level. Specifically, Perkebunan transmitted such complaints to its distributor, Consortium, in 1993 and 1995, and Consortium thereafter agreed to—and in fact did—maintain its prices in line with the cartel price. Consortium also reported below-cartel pricing in the American market to Perkebunan and attended meetings with Perkebunan in 1995 to discuss the producers' earlier meeting in Panang. Moreover, Consortium concealed from its customers the true reason for the price increase, blaming it instead on the rise in prices for the latex

used in the process of manufacturing extruded rubber thread.

FLE–USA was another of the distributors that reported price cutting by its American "competitors" to its parent. In addition, FLE–USA furthered the goals of the conspiracy by coordinating its price increases with other distributors in 1992, 1993, and 1995, and by refusing to offer discounts to end users when so instructed by other members of the conspiracy. FLE–USA knew of the existence of the cartel through its parent, Filati–Lastex, a participant in the Bali and Panang meetings.

Flexfil (RI) and Flexfil (NC), like their fellow distributor-conspirators, also implemented significant price increases in 1992, 1993, and 1995 to keep pace with the cartel price. Again, as did the other distributors, Flexfil (RI) and Flexfil (NC) reported instances of price cutting by other distributors to their Malaysian parent. Also in furtherance of the conspiracy, these entities refused requests for discounts from end users. And, like other distributor defendants, it is alleged that these distributors, too, knew they were acting on behalf and as part of a conspiracy because their corporate officers included officers of their parent Rubberflex, which had participated in the Bali and Panang meetings.

Finally, Rubfil–USA, another distributor-defendant, similarly followed the cartel's several price increases, reported price cutting to its Malaysian parent, refused requests for discounts, and knew of the conspiracy through an officer it shared with its parent and who attended the meetings in Asia.

This factual background, drawn from allegations in the second amended complaint, provides the context for disposition of the pending motions to dismiss.

## II

Defendant Bakrie contends that plaintiffs have not made a prima facie showing that the

---

**8.** The minutes, attached to the amended complaint and incorporated by reference in the second amended complaint, state starkly that

"the price of rubber thread should be set and determined by the manufacturers in total rather than let the market determine and set the

price. [The Malaysian producers'] rationale is that this industry is still controlled by a limited number of existing players, and we should take full advantage of this fact."

Amended Complaint, Exh. B.

Court may maintain in personam jurisdiction over it. *See Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir.1993) (placing burden of proving prima facie case of personal jurisdiction on plaintiff). Bakrie therefore seeks dismissal pursuant to Rule 12(b)(2), Fed. R.Civ.P.

The pertinent facts may be succinctly stated. Bakrie sells its extruded rubber thread to Globe, its exclusive distributor, in Indonesia. Title and risk of loss pass to Globe in Indonesia. Globe then advertises and seeks purchasers for Bakrie products in the United States. As a 25% owner of Bakrie, Globe has appointed two directors to Bakrie's board, and Bakrie officials visit the United States at least once a year for meetings with Globe officials. Bakrie argues that these facts are insufficient to support a finding of personal jurisdiction.

The prerequisites for obtaining personal jurisdiction are well established in this circuit. First, the plaintiff must point to a statute (usually a state's long-arm statute) or rule that authorizes service of process over the defendant. Second, the service of process pursuant to the specified statute or rule must comport with due process. *See Mylan Labs.,* 2 F.3d at 60. That is, the defendant must have sufficient minimum contacts with the forum such that haling it into court there would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct.

339, 342–43, 85 L.Ed. 278 (1940)); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985) (holding that the minimum contacts requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts" (internal quotation marks omitted)).

■ In the instant circumstances, the first prerequisite is met both by § 12 of the Clayton Act, 15 U.S.C. § 22, and by Rule 4(k)(2), Fed.R.Civ.P. Section 12 of the Clayton Act provides for nationwide—indeed worldwide—service of process when the antitrust defendant is a corporation. See 15 U.S.C. § 22 (providing for service "wherever [defendant] may be found").[9] Further, under Rule 4(k)(2), a defendant not subject to the jurisdiction of any state court[10] that is served with process is subject to personal jurisdiction in the federal courts as long as the assertion of jurisdiction (i) is consistent with federal law, and (ii) does not offend the Constitution.[11]

In this case, Bakrie was properly served in Indonesia pursuant to Rule 4(f)(2)(C)(ii), Fed. R.Civ.P. *See Dee–K Enterps. Inc. v. Heveafil Sdn. Bhd.,* 174 F.R.D. 376 (E.D.Va. 1997). Because the Clayton Act provides for worldwide service, service in Indonesia was consistent with federal law. Thus, plaintiffs need only show under Rule 4 that the service effected did not offend the Constitution. That same showing is required under the Clayton Act.[12] Thus, under either the Clayton

---

9. Of course, § 12 provides only that service may be effected worldwide; it does not prescribe the proper means for accomplishing the service. In that regard, a plaintiff must comply with Rule 4, Fed.R.Civ.P.

10. Plaintiffs have included in the second amended complaint allegations regarding the contacts of certain defendants with the Commonwealth of Virginia. None of these allegations refers to Bakrie. Therefore, the analysis under Rule 4(k)(2) is appropriate. To the extent that those allegations turn out to be correct with respect to other defendants, they may provide an alternate basis on which to found jurisdiction, namely, under Virginia's long-arm statute.

11. The rule provides in full:
    If the exercise of jurisdiction is consistent with the Constitution and laws of the United States,

serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.
Rule 4(k)(2), Fed.R.Civ.P.

12. *See Hogue v. Milodon Eng'g., Inc.,* 736 F.2d 989, 991 (4th Cir.1984) ("Where Congress has authorized nationwide service of process, so long as the assertion of jurisdiction over the defendant is compatible with [Fifth Amendment] due process, the service of process is sufficient to establish jurisdiction of the federal court over the person of the defendant."), *quoted in Autoscribe Corp. v. Goldman & Steinberg,* 1995 WL 56662, at *3 (4th Cir. Feb.3, 1995) (unpublished).
    Some courts have held that the venue provision of § 12 must be satisfied before worldwide

Act or Rule 4, any challenge to personal jurisdiction is governed by the familiar constitutional test of "fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158. In essence, the statutory analysis regarding service of process collapses into the constitutional inquiry.

The constitutional "fair play and substantial justice" test, as it has developed through the Supreme Court's jurisprudence, has two prongs. First, the defendant must "purposely avail" itself of the benefits and laws of the forum. *See Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). Second, the assertion of in personam jurisdiction over the defendant must be fair and reasonable; that is, the defendant should reasonably expect to be "haled into court" to defend the lawfulness of its conduct. See *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

■ Regarding the first prong, it is not enough that Bakrie sold the product with reason to expect that it would end up in the United States, for "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987) (plurality opinion).[13] The Fourth Circuit expressly adopted this position in *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939 (4th Cir.1994), in which it stated that the "touchstone of the minimum contacts analysis remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state." 35 F.3d at 945, *quoted in Owens–Illinois, Inc. v. Rapid Amer. Corp. (In re The Celotex Corp.)*, 124 F.3d 619, 629 (4th Cir. 1997). The Fourth Circuit went on to say that it would offend due process to "permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen." *Lesnick*, 35 F.3d at 946, *quoted in Owens–Illinois*, at 629.[14] In sum, then, in addition to placing the object in the stream of commerce, a plaintiff must show "[a]dditional conduct of the defendant [that] indicate[s] an intent or purpose to serve the market in the forum State."[15] *Asahi*, 480 U.S. at 112, 107

service of process is authorized. *See, e.g., Sea-Roy Corp. v. Parts R Parts, Inc.*, 1996 WL 557857 (M.D.N.C. July 30, 1996). The Malaysian defendants argue that the *Sea–Roy* case is controlling, and thus that plaintiffs must prove that venue is proper in this district before there is proper jurisdiction over them. The Fourth Circuit has yet to address this question. The Ninth Circuit, however, appears to have expressed the better view on this matter. *See Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1408 (9th Cir.1989) (holding that service may be effected under Clayton Act § 12 even when venue is established under 28 U.S.C. § 1391(d)). Given that the issues of venue and jurisdiction present two distinct inquiries, it follows that resolution of each issue may be founded on separate, distinct bases. Thus, plaintiffs may avail themselves of § 12 for service purposes and § 1391(d) for venue purposes. Accordingly, this objection to jurisdiction must fail.

13. There was no majority opinion in *Asahi;* thus, the validity of the stream-of-commerce theory remained debatable after that decision. In her plurality opinion, Justice O'Connor concluded that merely placing an object in the stream of commerce was insufficient to justify personal jurisdiction. Justice Brennan, in his concurrence, reasoned that when a party places a product in the stream of commerce and expects that it will be sold in the forum, "the possibility of a lawsuit there cannot come as a surprise." *Asahi*, 480 U.S. at 117, 107 S.Ct. at 1034 (Brennan, J., concurring in part).

14. *See also Federal Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 659 (4th Cir.1989) (holding that there can be no personal jurisdiction over a defendant that relinquishes control of its product to another because the "'unilateral activity of another party or a third person' cannot satisfy the 'minimum contacts' requirement of due process" (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984))).

Some circuits other than the Fourth have followed Justice Brennan's view and concluded that placing products into the stream of commerce is sufficient to establish in personam jurisdiction. *See, e.g., Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir.1992); *Irving v. Owens–Corning Fiberglas Corp.*, 864 F.2d 383, 386 (5th Cir.1989).

15. The relevant forum in this case is the United States, not any particular state. That is so because, when Congress has provided for nationwide service of process, as in § 12 of the Clayton Act, the defendant need only have minimum contacts with the nation as a whole. *See Go–Video*, 885 F.2d at 1414 (using national contacts under § 12 of the Clayton Act); *Fitzsimmons v. Barton*,

S.Ct. at 1032; *see also Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804 (1984) (finding that defendant's intentional conduct weighed in favor of asserting in personam jurisdiction because there was a greater likelihood that defendant expected litigation in the forum). Such additional, intentional conduct may consist of "designing the product for the market in the forum advertising in the forum . . . establishing channels for providing regular advice to customers in the forum . . . or marketing the product through a distributor who has agreed to serve as the sales agent in the forum. . . ." *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032.

■ As for the second prong, which requires that the assertion of jurisdiction be fair and reasonable, a court must weigh "(a) the burden on the defendant, (b) the interests of the forum . . . (c) plaintiff[s'] interest in obtaining relief, (d) the efficient resolution of controversies as between [the potential fora involved], and (e) the . . . interests . . . in furthering fundamental substantive social policies." *Lesnick,* 35 F.3d at 946. These principles, applied here, compel the conclusion that Bakrie is subject to personal jurisdiction in the United States.

■ Bakrie alleges that it is a company organized under the laws of Indonesia, has no offices or agents in the United States, holds no assets in this country, has never entered into any contracts for the sale of rubber thread in the United States, and sells its products and delivers title to them to Globe in Indonesia. Moreover, according to Bakrie, it is Globe, not Bakrie, that sets the

prices for extruded rubber thread sold to end users in the United States. Bakrie's only direct contact with the United States appears to be through its executives who travel to the United States at least once a year for meetings with Globe. That contact is minimal indeed—and arguably insufficient to clear even the low threshold established by *International Shoe* and its progeny. *See Young v. F.D.I.C.,* 103 F.3d 1180, 1191 (4th Cir.1997) (holding that it offended fair play and substantial justice to hale into court a defendant corporation that was organized under the laws of another country, that conducted all of its business in that country, that had no offices or employees in the forum, and whose employees never traveled to the forum to conduct business), *cert. denied,* —— U.S. ——, 118 S.Ct. 329, 139 L.Ed.2d 255 (1997).[16] Furthermore, the mere presence of Bakrie's product in the United States is not a contact that subjects it to in personam jurisdiction. *See Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032; *Lesnick,* 35 F.3d at 946. Globe, not Bakrie, imports the thread into this country; and Bakrie's introduction of its product into the stream of commerce, by itself, is an insufficient basis for personal jurisdiction under *Asahi* and *Lesnick.*

■ Plaintiffs, however, contend that Bakrie customizes its product for the U.S. market, and that it is therefore subject to in personam jurisdiction. *See Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032 (noting exception for defendant who "design[s] the product for the market in the forum"). In support of the "customizing" argument, plaintiffs rely specifically on statements by Globe, Bakrie's

589 F.2d 330, 332–33 (7th Cir.1979) (discussing nationwide service under § 27 of the Securities Exchange Act of 1934); *Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund,* 964 F.Supp. 1040, 1045 (E.D.Va.1997) (holding that national-contacts theory applies under ERISA's nationwide-service provision). Moreover, defendants conceded at the July 15, 1997 hearing that the national-contacts approach was proper (Tr. at 23–24, 51, 60). Given this national-contacts approach, the only jurisdictional question remaining with respect to the Malaysian defendants, who also challenge the assertion of personal jurisdiction over them, is whether venue is proper in this district. That issue is taken up in Part III.

The Supreme Court declined to rule on validity of the national-contacts approach in *Asahi. See*

480 U.S. at 113 n. *, 107 S.Ct. at 1032 n. *; *see also Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 102 n. 5, 108 S.Ct. 404, 408 n. 5, 98 L.Ed.2d 415 (1987) (again passing on the question).

16. *See also Sea–Roy,* 1996 WL 557857. In *Sea–Roy,* one of the defendants was a German company that had no U.S. affiliates; had no officers, employees, or agents in the United States; sold its goods F.O.B. Germany; and maintained no control over the marketing activities of the distributor. On those facts, the district court refused to find that there was purposeful availment by the defendant.

distributor in the United States, in which Globe assures its customers that it can furnish them with rubber thread produced by Bakrie in various sizes—measured in different gauges—and in various colors.[17] This argument is unpersuasive. Merely providing standard sizes and colors according to a customer's request is insufficient to create an inference that the product is custom-made or designed for a specific market. Were this not so, then any time a foreign manufacturer produced goods in more than one size or color, a plaintiff could invoke the customization argument in support of personal jurisdiction. Neither *Asahi* nor *Lesnick* calls for such a result.

To be sure, a defendant is not normally subject to personal jurisdiction when its sole contacts with the forum are through a third party, as appears the case with Bakrie. *See Lesnick*, 35 F.3d at 945 (noting that a defendant should be subject to suit based only on its own "deliberate conduct" and not "on the activity of third persons"). But *Asahi* teaches that there is an important exception to

this principle, namely when a defendant is "marketing the product through a distributor who has agreed to serve as the sales agent in the forum." *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032. This is precisely the case presented here. The record discloses that Globe is Bakrie's exclusive distributor in the United States. It is difficult to imagine a situation more befitting the exception announced in *Asahi* than this one. Bakrie's product is not simply whisked away in the stream of commerce. To the contrary, Bakrie has chosen to employ an exclusive distributor in the forum, and in so doing, according to *Asahi*, it has purposefully availed itself of that forum. See 480 U.S. at 112, 107 S.Ct. at 1032.[18]

■ Nor can Bakrie escape this conclusion by reliance on the fact that it sells the thread to Globe F.O.B. Indonesia. Although not specifically addressed in this circuit,[19] settled and persuasive authority from other circuits makes clear that this factor alone does not immunize a seller from suit in this country.[20]

---

17. In a letter to one of its customers, Globe states, "We are not limited to the above inventory and will be happy to produce new Bakrie products...." The letter goes on to list several different gauges and colors in which the rubber thread is available. See Plaintiff's Reply to Renewed Motion to Dismiss of PT. Bakrie, Exh. A. Plaintiffs premise their argument not just on "how special" (e.g., the size and color differences) the goods are, but on the fact that Globe offers a custom-ordering system for Bakrie products.

18. Bakrie's physical absence from the United States does not render it immune to the Court's powers. "Although territorial presence frequently will enhance a potential defendant's affiliation with [the forum] ... it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines.... So long as a commercial actor's efforts are purposefully directed toward residents of another [forum, the Supreme Court has] consistently rejected the notion that an absence of *physical* contacts can defeat personal jurisdiction there." *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (internal quotation marks omitted) (emphasis added).

19. The Fourth Circuit has alluded to this factor, but has never squarely faced it. *See Lesnick*, 35 F.3d at 947. In *Lesnick*, the plaintiff sued a Massachusetts manufacturer of cigarette filters. The filter manufacturer sent its filters to a ciga-

rette manufacturer in Kentucky and New Jersey. The cigarettes were then sold in Maryland, where the alleged injury occurred. The court noted the importance of the purposeful-availment requirement and observed that a rule adopting the stream-of-commerce theory "would subject defendants to judgment in locations based on the activity of third persons and not the deliberate conduct of the defendant, making it impossible for defendants to plan and structure their business contacts and risks." 35 F.3d at 945. On the facts of that case, the Fourth Circuit refused to find that jurisdiction existed over the Massachusetts defendant. The panel went on to say, however, that its decision might have been different had the filter manufacturer directed its activity to a cigarette manufacturer in the forum. See 35 F.3d at 946–47. In the case at bar, of course, plaintiffs allege that Bakrie sold its product to Globe, whom it knew to be acting in the United States, the relevant forum here.

20. *See Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 282 (3rd Cir.1994) ("Nothing in Justice O'Connor's plurality opinion suggests that the fact that a foreign manufacturer or seller rids itself of title by a sale F.O.B. a foreign port is enough to insulate that manufacturer or seller from jurisdiction if there is [a distributor who markets the product]."); *Tobin v. Astra Pharmaceutical Products, Inc.*, 993 F.2d 528, 544 (6th Cir.1993) (stating that a defendant "cannot expect to rely solely on the use of an independent distributor to insulate it from suit"); *Vermeulen v. Renault, U.S.A.*,

■ It appears, then, that the Rule 4 or § 12 service on Bakrie satisfies that portion of the constitutional test that focuses on purposeful availment. But this is not the end of the due process inquiry. As noted above, the constitutional test for personal jurisdiction has two elements, both of which must be satisfied. Even if Bakrie, in some sense, purposefully availed itself of this forum, plaintiffs still must show, using *Lesnick's* multifactor analysis, that it would be fair and reasonable to require Bakrie to defend against this case in the United States. Underlying the *Lesnick* analysis is the theory that the "unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114, 107 S.Ct. at 1033, *quoted in Young*, 103 F.3d at 1192.

An evaluation of these factors in the context of this case points persuasively to the conclusion that it would be reasonable to require Bakrie to defend this case in the United States. Both the forum (the United States) and the plaintiffs have a strong interest in bringing Bakrie to court here, for doing so furthers enforcement of the federal antitrust laws, surely an important national policy. Failure to do so would immunize Bakrie from liability for any anticompetitive conspiracy in which it may have engaged, as it could not be forced to defend its actions anywhere. Were that the case, Bakrie would be free to violate the antitrust laws with impunity even though the antitrust injury occurred in the United States; indeed, the United States was the target of the violation. Moreover, unlike the situations presented in *Lesnick* and *Young*, there is no "controver-

sy" here between two interested fora that must be resolved; because the United States is the forum in this case, there is no other forum that could have an interest in enforcing the relevant provisions of the Sherman Act.

It is true that federal policy cannot supplant consideration of the burden the defendant would incur in defending an action in a foreign forum. That burden weighs heavily in the "fair play and substantial justice" analysis. *See Young*, 103 F.3d at 1192 (refusing to assert jurisdiction when burden on defendant would be substantial and when neither forum nor plaintiff had any significant interest in resolution of the dispute in the forum); *Lake Shore*, 886 F.2d at 661 (same). Even so, here the forum's and plaintiffs' interests in enforcing the Sherman Act and obtaining relief provide a weightier counterbalance—especially considering Bakrie's goal of conspiring to fix prices in the United States and reaping the benefit of that conspiracy.[21] Thus, defendant Bakrie's motion pursuant to Rule 12(b)(2), Fed.R.Civ.P., must be denied.[22]

## III

Next, there is the matter of venue. Defendants contend that even if in personam jurisdiction is established on the basis of aggregated, national contacts, venue in the Eastern District of Virginia is improper.

■ Section 12 of the Clayton Act lays venue in any district where the defendant is "found" or where it "transacts business." *See* 15 U.S.C. § 22. At first blush this would seem to be an insurmountable obstacle to suit in this district, as the foreign defendants here apparently cannot be found in any judicial district in the United States because they

---

*Inc.*, 985 F.2d 1534, 1548 (11th Cir.1993) ("[T]he fact that title to the Renault vehicles passed to AMSC in France rather than in the United States in no way determines the degree of contacts between the United States and [the defendant]."); *Benitez–Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 30 (1st Cir.1988) (Breyer, J.) ("The fact that title to the cookers passed in Brazil is beside the point, for if *International Shoe* stands for anything . . . it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings." (internal quotation marks omitted)).

21. The fifth *Lesnick* "fair play" factor has not been discussed. That factor, which considers furtherance of social policy, is, in this case, essentially a reiteration of the second, interest-of-the-forum factor, and thus need not be separately addressed.

22. Because jurisdiction exists over Bakrie, plaintiff's Motion for Jurisdictional Discovery must be denied as moot.

conduct their business abroad. Yet, this is not fatal to venue, for the Supreme Court has held that 28 U.S.C. § 1391(d), which provides that aliens may be sued in any district, overrides any special venue statute (such as the one contained in § 12 of the Clayton Act).[23] Thus, § 1391(d) eliminates any venue impediment to suit in this district with respect to the foreign defendants because they, as aliens, may be sued in any federal judicial district.

■ As to the American defendants, venue is proper in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred … or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b) (stating the venue rules for federal-question cases). In the case at bar, neither (1) nor (2) applies; thus, venue is proper as to all the American defendants in any district where one of them may be found.[24]

Plaintiffs have alleged some Virginia-related contacts of defendants, but the allegations are quite sparse. In addition to the boilerplate statement that defendants "are found or do business in the district or the state," Second Amended Complaint 2, plaintiffs assert that Heveafil sold its rubber thread in Virginia; that Rubfil had customers in Virginia and sold to them with the aid of its subsidiary, Rubfil–USA; that Rubberflex sold its thread in Virginia with the aid of its subsidiaries Flexfil (RI) and Flexfil (NC);

and that Consortium sold Perkebunan's product in this state. See Second Amended Complaint ¶¶ 5, 7, 8, 11, 12, 13, 16. Several defendants contend—and plaintiffs have yet to dispute—that these Virginia contacts were located in the Western District of Virginia, not the Eastern District, and thus that venue here is improper. Not all defendants, however, have objected to venue being laid in this district. That fact might suggest that there are indeed sufficient contacts with this district such that at least one of the American distributors can be "found" here, thus satisfying § 1391(b)(3). Yet no specific allegation to that effect is found in the second amended complaint. At this time, therefore, it is unclear whether venue is proper in the Eastern District of Virginia. Accordingly, plaintiffs must show that venue in this district is proper, or the action may be transferred to the Western District of Virginia. A separate order will be issued providing plaintiffs with an opportunity to remedy this deficiency.

## IV

■ *Estate Construction Co. v. Miller & Smith Holding Co.*, 14 F.3d 213 (4th Cir. 1994), holds that a plaintiff alleging an antitrust conspiracy

> must provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken place. Dismissal of a bare bones allegation of antitrust conspiracy without any supporting facts is appropriate.

14 F.3d at 221 (internal quotation marks omitted); *see id.* (stating that the allegations

---

**23.** *See Brunette Machine Works, Ltd. v. Kockum Industries, Inc.*, 406 U.S. 706, 714, 92 S.Ct. 1936, 1941, 32 L.Ed.2d 428 (1972) (holding that § 1391(d) is "a declaration of the long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special"); *cf. Go–Video*, 885 F.2d at 1413 (holding that venue need not be established under the same statute that provides the basis for service of process).

**24.** The fact that the foreign defendants can be *sued* in this district pursuant to 28 U.S.C.

§ 1391(d) does not mean that they can also be *found* in this district, thereby creating a basis for proper venue as to the domestic defendants pursuant to § 1391(b)(3). Were this not so, in a case involving foreign and domestic defendants, § 1391(d) could be used as to the foreign defendants to circumvent the requirements of § 1391(b) as to the domestic defendants. Neither the statute as a whole, nor sensible policy, permits such a result. When, as here, there are both foreign and domestic defendants, § 1391(b) must be satisfied as to the domestic defendants.

shall be "neither vague nor conclusory").[25]

Citing *Estate Construction*, defendants next argue that the factual allegations in the second amended complaint are insufficient as a matter of law to support a claim against the distributor-defendants under the Sherman Act, and therefore that the complaint must be dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P. The short answer to this contention is that the second amended complaint, unlike the original complaint, contains more than "a bare bones allegation of antitrust conspiracy." 14 F.3d at 221.[26] It includes references to particular meetings between distributors and producers, a listing of the acts engaged in by distributors in furtherance of the conspiracy, and a description of how the terms of the cartel were enforced.[27]

It is true that the second amended complaint does not list any specific times or dates or any particular communications (with one exception—the facsimile letter discussed below) to substantiate the allegations as they relate to the distributors. Certainly if plaintiffs were to provide the times and details of conspiratorial meetings, that would be sufficient. But *Estate Construction* holds that such details must be provided "whenever possible." Thus it would appear that at least in some instances—when providing that information is not possible—failure to list "details of the time, place and alleged effect of the conspiracy" would not defeat a plaintiff's claim. Indeed, the *Estate Construction* opinion suggests that a plaintiff can survive a Rule 12 motion when, as here, the complaint contains "allegations of communications, meetings, or other means through which one might infer the existence of a conspiracy." 14 F.3d at 221.[28]

Paragraphs 34–39 of the second amended complaint furnish such allegations. Therein, plaintiffs assert that the defendant-distributors (i) coordinated a series of significant price increases in the United States from 1992 to 1995; (ii) reported to the producers any prices of other distributors that were

25. While some may view *Estate Construction* as a retreat from notice pleading, its narrow and sharp focus is the proper role of discovery in an antitrust-conspiracy case. Federal discovery, which extends beyond the boundaries of the relevant to include that which might lead to the relevant, can often be extensive, expensive, and burdensome. Before this is inflicted on defendants, it is reasonable to insist that the claim asserted be based on more than a plaintiff's hope or suspicion. In other words, discovery is the cart, not the horse, and skeletal allegations of antitrust conspiracy based on no more than hope or suspicion wrongly put the cart before the horse. *Estate Construction*, with its requirement for specific allegations, ensures that this will not occur.

26. As noted above, the original complaint did not contain factual allegations sufficiently specific to survive *Estate Construction*. That complaint was dismissed without prejudice, and plaintiffs subsequently filed the amended complaint, and then the second amended complaint. Defendants do not challenge that the second amended complaint states a claim with respect to the manufacturer-defendants. Paragraphs 29–33 provide specific factual allegations with respect to those parties.

27. Plaintiffs' suggestion that *Estate Construction* requires only that the *conspiracy* be pled with specificity, but that it does not require specific allegations with regard to each and every defendant, is without merit. Plaintiffs rely on a district court case in this circuit, *In re Mid–Atlantic Toyota Antitrust Litigation*, 525 F.Supp. 1265 (D.Md.1981) (concluding that if a plaintiff has properly alleged an antitrust conspiracy, it need only plead enough facts regarding later co-conspirators to give those co-conspirator-defendants notice of the charges against them). Plaintiffs' reliance is misplaced. The Fourth Circuit cited *Mid–Atlantic* in its *Estate Construction* opinion and noted that the plaintiff in that former case met the requirements for pleading an antitrust conspiracy only because he "included the persons in attendance at the meetings, the topics discussed, and the impact these meetings had on the alleged conspiracy to restrain price competition." *Estate Construction*, 14 F.3d at 222. Therefore, on its facts *Mid–Atlantic* is consistent with the requirements of *Estate Construction*, and to the extent *Mid–Atlantic* is construed as requiring less than *Estate Construction*, the former has been overruled by the latter.

28. The next sentence of the opinion reads, "Nor does [the complaint] provide any details of the time, place and alleged effect of the conspiracy." 14 F.3d at 221 (internal quotation marks omitted). Logically there would be no reason to include this second sentence if the elements of time, place, and effect did not constitute an additional, independent basis for alleging a conspiracy separate from the proof of "communications, meetings, or other means" that also carries the antitrust plaintiff over the *Estate Construction* hurdle.

below the level set by the conspirators; and (iii) refused requests from end users for discounts when they were instructed to do so by the producers. As further support for the conspiracy allegation as it concerns the distributors, plaintiffs have adduced a facsimile letter [29] in which an employee of Flexfil (NC), an American subsidiary of Malaysian producer-defendant Rubberflex, complains to an employee of Rubberflex that Heveafil is not keeping up its side of the bargain and that it is charging prices below the agreed-on level. The Flexfil employee further notes that another conspirator asked why they were "starting [to raise prices] so soon." [30] This document invites the inference that the distributor-defendants not only were aware of, but in fact participated in, the conspiracy. In sum, the statements contained in this fax, combined with the allegations of paragraphs 34–39 of the second amended complaint, provide sufficient detail regarding the distributors' role in the conspiracy, and thus satisfy the requirements set forth in *Estate Construction.* Therefore the motions to dismiss must be denied to the extent they allege a lack of specificity in the second amended complaint.

## V

Defendants contend that *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), bars this action because plaintiffs are indirect purchasers of extruded rubber thread who do not buy directly from the alleged producer-conspirators.[31] In *Illinois Brick* the Supreme Court held that an indirect purchaser—that is, one who does not buy directly from the antitrust violator, but who is instead at least one step removed in the distribution chain—cannot maintain a private antitrust action because the indirect purchaser is not "injured in his business or property" as required by § 4 of the Clayton Act. *See* § 15 U.S.C. § 15(a).[32]

The rationale of *Illinois Brick* is that if an *indirect* purchaser were allowed to recover under the antitrust laws on a pass-on theory, that "would create a serious risk of multiple liability for defendants," who might still be subject to suit by the direct purchasers. *See* 431 U.S. at 730, 97 S.Ct. at 2066–67. Moreover, were both direct and indirect purchasers allowed to recover from the conspirator-defendants, lower courts would face the daunting, if not impossible, task of calculating exactly which overcharges the direct purchasers suffered, and which the indirect purchasers suffered. In the words of the *Illinois Brick* opinion, "the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and re-

---

**29.** *See* Plaintiffs' Reply to Renewed Motion to Dismiss of Malaysian Defendants, Exh. A.

**30.** The Malaysian defendants assert that this fax concerns compliance with the antidumping order discussed below, not any conspiracy; that its date bears no relation to the date of the alleged conspiracy; and that even if there were a conspiracy, this document implicates only Flexfil, and not any of the other distributors. This argument at best creates a genuine issue of fact that is not appropriately resolved at this stage of the litigation.

**31.** This contention assumes that the conspiracy includes only the manufacturers, allegations against the distributors having fallen victim, presumably, to the strictures of *Estate Construction.* To be sure, the result reached in Part IV is to the contrary: the allegations against the distributors survive. In this event, of course, the *Illinois Brick* issue disappears (with one exception) because plaintiffs are no longer indirect purchasers. The exception concerns the non-joinder of

Globe and JPS as defendants in this action. *See infra* notes 1154–56 and accompanying text.

**32.** *Illinois Brick* was based on an earlier Supreme Court case, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe,* the Supreme Court rejected the antitrust defendant's argument that the plaintiff suffered no injury because it had "passed on" to its own customers any overcharge that it might have incurred as a result of the defendant's anticompetitive pricing. See 392 U.S. at 494, 88 S.Ct. at 2232. *Illinois Brick* presented the inverse issue, namely, whether an antitrust plaintiff could make offensive use of the pass-on theory. The indirect-purchaser plaintiffs in *Illinois Brick* alleged that the defendants, concrete-block manufacturers, charged their customers anticompetitive prices, and that those prices were then passed on to the plaintiffs. Consistent with its *Hanover Shoe* decision denying defendants a pass-on defense, the Supreme Court in *Illinois Brick* disallowed plaintiffs from invoking the pass-on theory as well.

duce the effectiveness of already protracted treble-damages proceedings." 431 U.S. at 732, 97 S.Ct. at 2068. To avoid this, the Supreme Court held that it is "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, [who] is the party 'injured in his business or property' within the meaning of [§ 4 of the Clayton Act.]" 431 U.S. at 729, 97 S.Ct. at 2066.[33] Consequently, indirect purchasers suffer no cognizable legal injury, and thus have no right to bring an antitrust action against a manufacturer.

■ For these plaintiffs to survive the instant motions to dismiss, then, they must prove that the distributors (the entities from whom they purchased the thread), and not just the producers, were part of the conspiracy. That is, they cannot merely allege that the distributors passed on an anticompetitive price that they themselves had paid to the rubber-thread producers; plaintiffs must prove that they were direct purchasers from the antitrust violators (the producer-distributor cartel). This proof, however, is really a variation on the *Estate Construction* problem discussed above: Plaintiffs have alleged that the distributors joined in the conspiracy and that they actively participated in it. If those allegations are legally sufficient under *Estate Construction,* then by definition plaintiffs have properly included the distributor-defendants as part of the conspiracy, and they have overcome this threshold *Illinois Brick* hurdle.

■ Even if plaintiffs were to fail to state a claim against the distributors under *Estate Construction*—and thus even if they were deemed only indirect purchasers from the conspiracy—they would not necessarily be foreclosed from suing the manufacturer-defendants. The Supreme Court recognized in *Illinois Brick* that there "might be" an exception to the indirect-purchaser rule when "the direct purchaser is owned or controlled" by the manufacturer. *See* 431 U.S. at 736 n. 16, 97 S.Ct. at 2077 n. 16.[34] This exception was justified by the recognition that, in such instances, the price charged by the "middleman" would be dictated by the conspirator and not by market forces. *See id.* at 736 & n. 16, 97 S.Ct. at 2070 & n. 16. That result, of course, is anathema to the basic goal of the antitrust laws to encourage market-driven pricing and robust competition.

Since *Illinois Brick,* the Supreme Court has not squarely revisited and addressed the ownership-control exception it raised in footnote 16 of *Illinois Brick.* Although *Illinois Brick* noted only the possibility of such an exception, in a subsequent indirect-purchaser case the Supreme Court suggested that it would find such an exception were it directly faced with the question. *See California v. ARC America Corp.,* 490 U.S. 93, 97 n. 2, 109 S.Ct. 1661, 1663 n. 2, 104 L.Ed.2d 86 (1989) (recognizing that *Illinois Brick* "noted two possible exceptions" to the indirect-purchaser rule, one of which is the ownership-control exception).[35] Furthermore, subsequent cases

---

**33.** Though the practical result of the *Illinois Brick* holding is that certain entities will be barred from bringing suit, the Supreme Court was careful to point out that its decision was not based on principles of standing, but on those of antitrust injury: "[T]he question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4." 431 U.S. at 728 n. 7, 97 S.Ct. at 2065 n. 7.

**34.** Again, reliance on this exception affords an *alternative* basis for denying the motions to dismiss. But it is an important basis to establish, because if plaintiffs are unable to prove liability on the distributors' part at trial, then they will be deemed indirect purchasers from the manufacturer-conspirators, in which case the *Illinois Brick* problem would arise anew. For a similar

approach, see *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 604–05 (7th Cir.1997) (deciding the *Illinois Brick* issue as an alternate basis for its ruling).

**35.** Though the Supreme Court stated firmly in one later case that there are no exceptions to the indirect-purchaser rule of *Illinois Brick,* it did not explicitly renounce the language of footnote 16. *See Kansas v. UtiliCorp United,* 497 U.S. 199, 216–17, 110 S.Ct. 2807, 2816–17, 111 L.Ed.2d 169 (1990) (refusing to create an exception for purchasers from utilities that allegedly passed on to their customers all of the costs they had incurred as a result of anticompetitive prices charged by a gas pipeline). Specifically, the Supreme Court stated that "ample justification exists for our stated decision not to 'carve out exceptions to the [indirect purchaser] rule for particular types of markets.'" *Id.* at 216, 110 S.Ct. at 2817 (quoting *Illinois Brick,* 431 U.S. at

in circuit and district courts have relied on the language of *Illinois Brick* in allowing for just such an exception.[36] Finally, counsel for defendants conceded at oral argument that there is an ownership-control exception to the indirect-purchaser rule.

■ Given that this exception has gained a strong foothold in federal antitrust jurisprudence, the next task is to discern whether plaintiffs here have sufficiently alleged facts to support the application of the exception in this case. Of course, at this stage of the proceedings, plaintiffs need not prove that such ownership or control actually existed between the producers and distributors; they need only allege facts sufficient to defeat the motions to dismiss. The second amended complaint asserts that each of the distributor-defendants who sold rubber thread on behalf of the Malaysian producers is a subsidiary, or is controlled and/or owned by, one of the manufacturer-defendants. *See* Second Amended Complaint ¶¶ 10–13.[37] Because plaintiffs have alleged facts that indicate ownership or control relationships with respect to these defendants, they avoid, at least at the pleading stage, the limitations imposed by *Illinois Brick's* indirect-purchaser rule as it relates to those parties, namely, Rubfil, Rubberflex, and Filati Lastex.

■ One final *Illinois Brick* issue merits discussion. The precise question is whether this action can proceed without plaintiffs having to name as defendants all distributors involved in the conspiracy—specifically Globe, the distributor for Bakrie, and JPS, the distributor for Longtex. *Illinois Brick* is designed to prevent defendants from being subject to multiple liability first to indirect purchasers, and then later to direct purchasers—thus the indirect-purchaser prohibition. When a plaintiff-indirect purchaser alleges that the direct purchasers were part of the conspiracy, however, the usual rule does not apply. The reason is twofold. First, the plaintiff has in a sense converted itself into a direct purchaser—in this event from the producer-distributor unit. Thus, *Illinois Brick* is not implicated. Second, there is no danger of double liability on the producers' part because the antitrust laws prohibit one co-conspirator from suing another.[38] This co-

---

744, 97 S.Ct. at 2074). That comment, however, was made in the context of a plaintiff seeking an exception for a particular *industry*, not an exception for certain corporate structures and relationships (as is the case with the ownership-control exception).

**36.** *See, e.g., In re Wyoming Tight Sands Antitrust Cases (Kansas v. Amoco Production Co.)*, 866 F.2d 1286, 1293 (10th Cir.1989) (recognizing, but refusing to apply, the control exception); *Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.*, 852 F.2d 891, 900 (7th Cir.1988) (en banc) (Fairchild, J., concurring in part) (recognizing the ownership-control exception); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1213 (9th Cir.1984) (same); *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 968 n. 22 (3rd Cir. 1983) (same); *In re Mid–Atlantic Toyota Antitrust Litigation*, 516 F.Supp. 1287, 1293 (D.Md.1981) (finding that the Supreme Court "expressly recognized" the ownership-control exception); *Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091, 1102 (D.Md.1979) (explaining that "the exception could be stated as the situation where a seller owns or controls its customer, who then sells directly to plaintiff"); *cf. Jewish Hosp. Ass'n v. Stewart Mechanical Enterps.*, 628 F.2d 971, 975 (6th Cir.1980) (limiting the control exception "to relationships involving such functional economic or other unity between the direct purchaser and ... the defendant ... that there effectively has been only one sale").

**37.** As an example of this control, plaintiffs note that Rubberflex has reported to the Department of Commerce that some of its sales in the United States went through Flexfil (NC), its subsidiary, only as an agent; that Flexfil does the sales paperwork, but that the thread never passes into its inventory or accounting records; and that Rubberflex ships directly to its American customers. *See* Plaintiffs' Reply to Renewed Motion to Dismiss of Malaysian Defendants, Exh. D.

**38.** "A plaintiff's complete, voluntary, and substantially equal participation in an illegal practice under the antitrust laws precludes recovery for that antitrust violation." *Sullivan v. National Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994) (internal quotation marks omitted); *cf. Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310, 105 S.Ct. 2622, 2628–29, 86 L.Ed.2d 215 (1985) (concluding that plaintiff in securities action is barred from suit when "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress" (citing and distinguishing *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968) (holding that in pari delicto doctrine is not a defense in antitrust actions))). The Supreme Court in *Perma Life* reserved the question whether "truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart

conspirator rule would prohibit any conspirator-distributors from recovering against the producers. These principles would typically lead plaintiffs to name all "middlemen" as part of the conspiracy.[39] If they did not do so, then any distributor not named as a defendant, and thus not found to be a co-conspirator, could sue the other distributors and producers at a later date. In that event, the specter of multiple liability would reappear.

Though plaintiffs here did not name all of the distributors, including Globe and JPS,[40] that does not preclude them from maintaining this action. The class of end users whom plaintiffs claim to represent includes only those entities that bought extruded rubber thread directly from a defendant or its subsidiary. Therefore, if plaintiffs ultimately succeed in this action, they will not recover any damages for purchases from Globe, JPS, or any other unnamed distributor. Then, if a subsequent plaintiff in a subsequent action were to succeed in recovering for purchases from those unnamed distributors, that would be the first time any defendant would have to pay damages for sales by the now-unnamed distributors. Significantly, the producer-defendants named here could also be named as defendants and found liable in the subsequent action yet still not incur double liability. While they would be paying "twice," the judgments they would suffer would relate to two distinct injuries. Moreover, even if JPS

and Globe themselves later sued the producers, they would not run afoul of *Illinois Brick*. Those distributors, as direct purchasers from the producers, are indeed the preferred plaintiffs under *Illinois Brick*. *See* 431 U.S. at 746, 97 S.Ct. at 2074–75 (noting that by its holding the Court has "elevat[ed] direct purchasers to a preferred position as private attorneys general"). But, as noted above, any recovery they would enjoy would be distinct from the damages awarded in the instant case. In short, given the limited scope of the instant class, the two actions would address separate injuries, thereby eliminating the possibility of multiple liability.

There is one last group of potential plaintiffs that deserves examination, namely the distributors who are named as defendants in this action. If those entities are found here to have participated in the conspiracy, they will be foreclosed under the co-conspirator doctrine from recovering in a future action. *See Columbia Nitrogen*, 451 F.2d at 15–16. Even if they are found not to have participated in the conspiracy, however, there is no risk of duplicative liability. Assume first that plaintiffs here recover from the producers on the theory that the distributors, though not co-conspirators, were wholly owned or controlled by the producers. In that case, the distributors would not even bring a future action for no captive or owned subsidiary would sue its parent.[41] Second, if

from the idea of in pari delicto, for barring a plaintiff's cause of action." 392 U.S. at 140, 88 S.Ct. at 1985. The Fourth Circuit posited its own answer to that question three years later, based on the majority and concurring opinions of *Perma Life*: "[W]hen parties of substantially equal economic strength mutually participate in the formulation and execution of the scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from each other." *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 15–16 (4th Cir.1971).

**39.** *See, e.g., Link v. Mercedes–Benz of North Amer., Inc.*, 788 F.2d 918, 931 (3rd Cir.1986) (stating that *Illinois Brick* doctrine applies to vertical-conspiracy cases); *In re Midwest Milk Monopolization Litigation*, 730 F.2d 528, 531 (8th Cir.1984) (same).

**40.** It appears from the parties' papers that one reason plaintiffs may not have named Globe as a

defendant is that plaintiffs' counsel represented Globe in an antidumping proceeding in 1993. Joinder of Globe thus might disqualify plaintiffs' counsel. Because there is nothing in the record to support this theory, however, and because its validity has no bearing on the disposition of the instant motions, no view on the matter is expressed.

JPS was named as a defendant in the original and first amended complaints, but not in the second amended complaint. *See supra* note 4.

**41.** The Ninth Circuit has noted that "[t]here is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator." *Royal Printing Co. v. Kimberly–Clark Corp.*, 621 F.2d 323, 326 (9th Cir.1980). The court went on to recognize that there could be some instances in which the subsidiary might in fact sue the parent—for instance, in a derivative action brought by outside shareholders. In that event, however,

the factfinder in this action were to conclude that the distributor-defendants were not wholly owned or controlled by the producers, then plaintiffs here could not recover under the footnote 16 exception, and thus any recovery by the present distributor-defendants in a future action would constitute the first imposition of liability for the conduct alleged here.

■ And, as a last matter concerning the non-joinder of Globe and JPS, even though Bakrie and Longtex, the producers who employed the services of those distributors, cannot be held liable in this action for sales by their distributors, they are properly named as defendants here. As co-conspirators, Bakrie and Longtex are jointly and severally liable for any injury caused by the conspiracy, even if that injury did not result from a sale of their own product. *See, e.g., Burlington Indus., Inc. v. Milliken & Co.,* 690 F.2d 380, 391 (4th Cir.1982); *In re Cement and Concrete Antitrust Litigation,* 817 F.2d 1435, 1439 (9th Cir.1987); *In re Midwest Milk Monopolization Litigation,* 730 F.2d 528, 531 (8th Cir.1984).

In sum, then, the only future liability to which the present defendants could be exposed would not duplicate the damages, if any, awarded in this action, and thus plaintiffs have managed to steer clear, for now, of any obstacle posed by *Illinois Brick.*

### VI

Defendants' final argument for dismissal focuses on the antidumping order imposed on them by the Department of Commerce ("DOC").

■ The federal antidumping laws are designed to protect American industries from low-priced imports. See 19 U.S.C. §§ 1673–1677b. Specifically, they allow an American company to petition the DOC and the International Trade Commission and show that foreign entities are selling products in the United States at less than a "fair value" and that those sales are injuring the petitioner. ("Dumping" is the sale of imports at less-than-fair-value prices.) The fair value is measured, in most circumstances, relative to the price of the product in the producer's home market. If the DOC finds the petitioner's showing persuasive, it will order the American importer (not the foreign exporter) to pay a duty on any products it imports that are sold in this country below fair value. The DOC does not, however, order the exporter to raise its U.S. prices, though this is certainly an option for foreign manufacturers who wish to pass on the cost of the duty to their customers.

In this case, the DOC issued an antidumping order, which remains in effect, that applies to all imports of extruded rubber thread from Malaysia. *See Extruded Rubber Thread from Malaysia,* 57 Fed.Reg. 38,465 (1992) (final determination). The DOC has imposed duties on the Malaysian producers ranging from 1.88% to 50% above each producer's current U.S. price.

While accepting the prior ruling in this case that the antidumping order does not foreclose a price-fixing claim as a matter of law,[42] defendants contend that plaintiffs here, as a matter of law, could not have suffered any antitrust injury. In other words, defendants do not contend that the antidumping order prevents a finding that there was a conspiracy to fix prices. Instead, they assert that, regardless of any conspiracy, plaintiffs

the court stated that the "small risk of multiple recovery" did not tip the balance in favor of the defendants. See id. If, as the facts develop in this case, it appears that suit by one of the distributors against its parent is likely, or at least more than a remote possibility, and that there is thus a possibility of duplicative liability, defendants may raise this issue again at that time.

Only a year after *Illinois Brick* was decided, the Third Circuit, relying on footnote 16 of *Illinois Brick,* allowed a plaintiff that purchased from a subsidiary corporation to maintain an action against the parent corporation. The Third Circuit explained: "To adopt any other view would invite evasion by the simple expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser." *In re Sugar Antitrust Litigation (Stotter & Co. v. Amstar Corp.),* 579 F.2d 13, 19 (3rd Cir.1978). That observation has particular force in light of the facts of this case.

42. *See Dee–K Enterps. Inc. v. Heveafil Sdn. Bhd.,* 174 F.R.D. 376 (1997) (order) (Sherman Act § 1 proscribes a conspiracy to fix prices no matter what the fixed price is).

suffered no antitrust injury because imposition of· the antidumping order necessarily indicated that defendants' allegedly fixed prices for extruded rubber thread were too low. Defendants' argument, distilled to its essence, amounts to the contention that "we cannot be forced to pay damages for conspiring to fix prices that are, by DOC's definition, below fair value and hence below the competitive price." In so · arguing, defendants rely on two Supreme Court cases holding that a plaintiff cannot win a price-fixing claim when a defendant's prices are set according to rates approved by a governmental agency. See *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). Defendants' contention is unpersuasive and their reliance on *Keogh* and *Square D* is misplaced.

In *Keogh*, a group of rail carriers set uniform rates, filed the rates with the Interstate Commerce Commission ("ICC"), and charged those rates to their customers. The carriers' shipper-customers sued the carriers on a price-fixing theory. The Supreme Court held that the ICC could approve uniform rates without subjecting· the carriers to antitrust liability. The Supreme Court reasoned that "[i]njury implies violation of a legal right[, and the rate set by the commission] is made, for all purposes, the· legal rate, as between carrier and shipper." 260 U.S. at 163, 43 S.Ct. at 49. It further explained that "[t]o be legal a rate must be nondiscriminatory.... But it is the Commission which must determine whether a rate is discriminatory...." *Id.* at 164, 43 S.Ct. at 50. In *Square D*, a case involving facts similar to *Keogh*, the Supreme Court opined that while "ratemaking activities are not *immunized*

from antitrust scrutiny simply because they occur in a regulated· industry," the issue posed by *Keogh* is not "properly characterized as an 'immunity' question." 476 U.S. at 421–22, 106 S.Ct. at 1929–30 (emphasis added). It is a question of "remedy," that is, a question of antitrust injury. *See id.*

Relying on these two cases, defendants here argue that once the DOC set the fair value of extruded rubber thread, their prices became, by definition, lawful prices that could not subject the producers to any liability.[43] This result obtains, defendants contend, because the Malaysian producers' "prices cannot—at the same time—be both too high and too low."[44] Once the DOC determined that the prices were too low, the argument goes, it became impossible for a court to find that they were too high under the antitrust laws.

The superficial plausibility of defendants' either-or description disappears on closer examination. A finding by the DOC that an exporter's U.S. prices are too low is a finding that is based on the fair value as established in the producer's home country, not in the United States. "Below a fair value" does not mean "below competitive prices in the U.S. market." Each description relies on a separate benchmark, one measuring a fair value abroad and one a competitive price in the United States; and each benchmark is established for a different purpose, one to calculate an antidumping duty, and one to gauge the level of competition in the domestic market. In short, there is no conflict between the antidumping laws and the antitrust laws.[45]

Unlike the ICC's action in *Keogh* and *Square D*, the DOC here did not approve any

---

43. *See Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir.1994) (the "filed-rate doctrine" holds that rates filed with and approved by a governmental agency are, by definition, reasonable and thus unassailable by those paying the rates (citing *Keogh* and *Square D* )).

44. Defendants' Reply to Plaintiff's Opposition to Defendants' [Original] Motion to Dismiss at 2.

45. By way of illustration, assume that the competitive price in the United States for extruded rubber thread is $1.00 per pound. Assume fur-

ther that defendants sell their product in Malaysia for $1.40 a pound, and that they conspire to fix the U.S. price at $1.20 a pound. In that case, they would be subject *both* to the antidumping duty—for charging $0.20 less than the fair value—and to liability under the antitrust laws—for conspiring to fix prices at an anticompetitive level.

In any event, to the extent, if any, that the antidumping laws· and the antitrust laws establish conflicting goals, that is a matter for Congress, and not the courts, to resolve.

specific price to be charged. Plaintiffs note that foreign entities subject to an antidumping order have several options that would *not* require them to raise their U.S. prices.[46] Thus, the case at bar is unlike *Keogh*, in which the defendants were charging the only rate they could legally charge (the rate filed with the ICC). The *Keogh* Court reasoned that Congress would not expect the carriers to be sued in a price-fixing claim for doing what the law required them to do, and thus it held that the carriers could not be held liable for price-fixing. *See* 260 U.S. at 162–63, 43 S.Ct. at 49–50. Here, defendants did not have to charge one, uniform price; they could have charged any price they wished, as long as the duty was paid, and they certainly could have charged prices different from each other (unless, of course, they were abiding by the terms of a cartel). In addition, because the DOC sets the fair value and antidumping duties individually for each company, there is no reason that all of the Malaysian defendants' prices should have been uniform. Indeed, the fair values against which their exports were measured were not uniform, so there is no reason to expect that their ultimate sales prices would be uniform.

Also worth noting is that only the Malaysian defendants were subject to the antidumping order; the Thai and Indonesian producers were not. Thus, even if there were reason to assume that the Malaysian producers were required to set uniform prices—which they were not—there would still be no basis for concluding that the requisite uniformity extended to the Thai and Indonesian defendants. If the Malaysians conspired with the Thais and Indonesians to achieve that uniformity, the Malaysians would not be able to hide behind the antidumping order; that order did not control the pricing decisions of the Thai and Indonesian producers.

There is a final, simpler, and independent reason to deny the motions to dismiss on this ground. *Keogh* and *Square D* were cases involving rates filed with the ICC; the "filed-rate doctrine" they established has never been held to apply outside that context. *See* 2 Section of Antitrust Law, American Bar Association, *Antitrust Law Developments (Fourth)* 1127–28 (1997) (noting the narrow confines in which the doctrine is applied).[47] Without further guidance from Congress, it would be improvident to extend application of that doctrine to antidumping determinations by the DOC.

## VII

Based on the principles and conclusions set forth here, the motions to dismiss must be denied.

Appropriate orders have issued.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

**46.** In their briefs, plaintiffs assert that companies subject to antidumping-orders can lower the fair value of their product (by charging a lower price in the home country), contract with a U.S. importer who is willing to pay the tax, or simply accept and pay the antidumping duties. *See* Plaintiff's Memorandum in Opposition to Defendants' [Original] Motion to Dismiss at 7.

**47.** *See also In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3rd Cir.1993). In *Lower Lake Erie*, the Third Circuit refused to apply the *Keogh* doctrine to bar an antitrust complaint against certain railroads, even though the defendants had filed approved rates with the ICC. To hold that there was no injury, said the court, "would overextend *Keogh's* reach and could produce a rule that one who pays for services governed by ICC tariffs is foreclosed from asserting that antitrust violations prevented use of a less expensive, equivalent service." *Id.* at 1159. In other words, said the Third Circuit, *Keogh* does not shield an antitrust violator from liability for anticompetitive conduct that is outside the control of a governmental agency. *See id.* Most instructive for present purposes, perhaps, is the Third Circuit's observation that it was "fully consistent with *Keogh* ... to accept these rates as lawful and nonetheless to conclude that through non-rate activities ... the railroads effectively retarded entry of lower cost competitors to the market." *Id.* Here, as in *Lower Lake Erie*, it is fully consistent to treat the prices charged by the Malaysian entities as below fair value and nonetheless to conclude that those entities conspired to maintain anticompetitive prices.