729 F.2d 1208
 1984-1 Trade Cases 65,927
 STATE OF ARIZONA, Plaintiff-Appellant,
v.
SHAMROCK FOODS COMPANY, an Arizona corporation; and
Beatrice Foods Company, an Illinois corporation,
Defendants-Appellees.
Darryll J. ALTON, et al., Plaintiffs-Appellants,
v.
SHAMROCK FOODS COMPANY, an Arizona corporation, and Beatrice
Foods Company, an Illinois corporation,
Defendants-Appellees.
 No. 82-5875.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 13, 1983.
Decided April 3, 1984.
As Amended June 21, 1984.
 
 J. Michael Hennigan, Bretz & Hennigan, Los Angeles, Cal., for plaintiff-appellant.
 Charles R. Hoover, Jennings, Strouss & Salmon, Scottsdale, Ariz., for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before KENNEDY and BOOCHEVER, Circuit Judges, and EAST,* Senior District Judge.
 BOOCHEVER, Circuit Judge.
 
 
 1
 This is an action by five certified classes against several Arizona dairy product producers alleging a wholesale price-fixing conspiracy. During the course of the suit, all claims were settled except those by the consumer class against Shamrock Foods Co. and another producer joined six years after initiation of the suit. Shamrock moved for partial summary judgment on the ground that the consumers' claims for pass-on damages from purchases of dairy products through grocery stores were barred by Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The consumers contend that they have altered their theory of recovery to allege a retail price-fixing conspiracy including the intermediate grocery stores, thus avoiding Illinois Brick. The district court granted partial summary judgment finding the consumers estopped from changing theories of recovery so late in the litigation. The consumers appeal.
 
 Facts
 
 2
 Following the institution of a federal civil and criminal wholesale price-fixing suit against Shamrock Foods Co., Borden Inc., Carnation Co., Foremost-McKesson Inc. and six of their officers, a number of private suits were filed against the corporations seeking damages and injunctive relief. On December 11, 1974, the district court consolidated the actions and certified plaintiff classes of consumers, grocery stores, hospitals, restaurants, and governmental entities.
 
 
 3
 The five classes subsequently reached a $4,075,000 settlement with all defendants except Shamrock. The settlement agreement and a separate agreement allocating the fund among the five classes were filed with the district court in April 1978. On September 21, 1979, Shamrock settled with the hospital, restaurant, and governmental classes and in mid-1981 Shamrock settled with the grocery store class. The settlements and the allocation agreement were formally approved by the district court, and each expressly preserved the consumer class claims against Shamrock. Thus, the only remaining claims were the consumer claims against Shamrock. These claims were of two types: for overcharges in sales of dairy products through grocery stores and for overcharges in direct sales from Shamrock by home-delivery.
 
 
 4
 In mid-1982, Shamrock filed a motion for partial summary judgment to dismiss all claims of the consumers regarding damages for purchases of dairy products through grocery stores. It argued that Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) required dismissal of the consumers' claims. The consumers responded that they have changed their theory of recovery to allege a price-fixing conspiracy including the dairy producers and the grocery stores to fix the retail price of dairy products.
 
 
 5
 The consumers point out that Shamrock and the other defendant dairies made retail home delivery sales in addition to wholesale sales to grocery stores and thus were both suppliers to and direct horizontal competitors with the grocery stores. When the grocery store prices fell too low, Shamrock and the other dairy defendants lost home delivery sales to the grocery stores. The consumers contend that the dairy producers conspired among themselves and with the grocery stores to raise and stabilize the retail price of dairy products to maintain more profits for all concerned.
 
 
 6
 In support of their contention, the consumers cite deposition testimony of employees of several dairy producers including Shamrock President Norman McClelland. This testimony tends to support the consumers' allegations that the dairy producers held meetings to discuss retail prices and regularly had communications with grocery stores with the purpose of acting as a go-between to give assurances that a price increase by one retailer would be met by competing retailers.
 
 
 7
 The district court granted Shamrock's motion on July 23, 1982 and entered final judgment on those claims pursuant to Fed.R.Civ.P. 54(b) on September 23, 1982. The consumer class now appeals the grant of partial summary judgment to Shamrock. We reverse.
 
 Standard of Review
 
 8
 Reviewing a grant of summary judgment, the appellate court must view the evidence in the light most favorable to the party against whom summary judgment was granted and determine whether the trial court correctly found that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. Heiniger v. City of Phoenix, 625 F.2d 842, 843 (9th Cir.1980).
 
 Discussion
 
 9
 Shamrock makes two arguments that the grant of summary judgment is correct. First, they argue that when, as alleged in the present case, the policy concerns of Illinois Brick are present, that case bars suit no matter what theory is used. Second, they argue that the consumers relied to their advantage at various times on the wholesale price conspiracy/pass-on theory and may not at this late date change theories to a retail price conspiracy to avoid Illinois Brick. The district court granted summary judgment on the basis of both arguments.
 
 A. Illinois Brick
 
 10
 The consumers do not dispute that at the initiation of their suit, their focus was on a wholesale price-fixing conspiracy. Because this theory of necessity implies a pass-on of damages to the retail level, the consumers do not dispute that Illinois Brick would preclude their recovery on their original theory regarding their purchase of dairy products from grocery stores. But they contend that they have changed their theory; they now allege that the retail intermediates, the grocery stores, were co-conspirators with the dairy producers to fix the price of dairy products at the retail level, and that none of the damages now claimed are attributable to the wholesale conspiracy. The consumers argue that because they allege that the retail price was the one fixed, their theory of recovery does not depend on pass-on of damages; thus Illinois Brick does not apply.
 
 
 11
 We agree. The plaintiffs have offered to prove that the wholesale conspiracy ended in the early 1960's, and that the conspiracy was ineffective in raising prices charged to retail grocers. In these circumstances, Illinois Brick is no bar since there would be no wholesale overcharge to be passed on to the consumers. Instead, we would be presented with a conspiracy among horizontal competitors at the retail level to fix retail prices. Illinois Brick does not prevent this garden variety price-fixing claim.
 
 
 12
 Even if the plaintiffs were claiming a two-tier conspiracy, we would hold that Illinois Brick is no bar to the suit. Simply stated, the rule of Illinois Brick is that indirect purchasers in a chain of distribution are precluded from suing for damages based on unlawful overcharges passed on to them by intermediates in the distribution chain who purchased directly from the alleged antitrust violator. 431 U.S. at 746, 97 S.Ct. at 2074.[1] The Court recognized that indirect purchasers, even when able to trace an injury to an antitrust violation, are not in the "preferred position as private attorneys general" intended by Congress to enforce the antitrust laws. Id. The Court relied on two policy considerations to support its conclusion. First, it found that allowing every person along a chain of distribution to claim damages arising from a single violation of the antitrust laws would create a risk of duplicative recovery against the violator unintended by Congress. 431 U.S. at 730, 97 S.Ct. at 2066. The Court reasoned that direct purchasers absorb at least some and often most of the overcharges and are more likely to come forward to collect their damages. 431 U.S. at 746-47, 97 S.Ct. at 2074-75. Second, the Court sought to avoid increasing the cost and burden of antitrust actions with complicated damage theories necessitating massive evidence to determine how the overcharge was apportioned throughout the distribution chain. 431 U.S. at 731-32, 745, 97 S.Ct. at 2067, 2074.
 
 
 13
 The Court in Illinois Brick expressly noted, however, that the newly announced rule barring damage suits by indirect purchasers was not absolute.[2] Whether allegations of a retail price-fixing conspiracy such as the one alleged by the consumers would avoid the bar of Illinois Brick was expressly reserved by this circuit in In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 691 F.2d 1335, 1341 n. 9 (9th Cir.1982); see also In re Beef Industry Antitrust Litigation, 600 F.2d 1148, 1161-63 (5th Cir.1979) (also reserving issue), cert. denied, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). Numerous other courts have found Illinois Brick inapplicable to claims against remote sellers when the plaintiffs allege that the sellers conspired with intermediates in the distribution chain to fix the price at which the plaintiffs purchased. See, e.g., Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478 (7th Cir.1980); In re Mid-Atlantic Toyota Antitrust Litigation, 516 F.Supp. 1287, 1295-96 (D.Md.1981); Reiter v. Sonotone Corp., 486 F.Supp. 115, 119-20 (D.Minn.1980); Abrams v. Interco Inc., 1980-2 Trade Cas. p 63,292 at 75,552 (S.D.N.Y.1980); Vermont v. Densmore Brick Co., 1980-2 Trade Cas. p 63,347, at 75,778 (D.Vt.1980); Florida Power Corp. v. Granlund, 78 F.R.D. 441, 443 (D.Fla.1978); In re Anthracite Coal Antitrust Litigation, 1978-1 Trade Cas. p 62,059, at 74,587, 74,590 (D.Pa.1978); Gas-A-Tron of Arizona v. American Oil Co., 1977-2 Trade Cas. p 61,789, at 73,245 (D.Ariz.1977); see also Donson Stores, Inc. v. American Bakeries Co., 58 F.R.D. 481, 485 (S.D.N.Y.1973) (pre-Illinois Brick); Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 Cornell L.Rev. 309, 331-32 (1978). We examine the facts of the present case to determine if the policies underlying Illinois Brick require dismissal of the consumers' action. Blue Shield v. McCready, 457 U.S. 465, 473, 102 S.Ct. 2540, 2546, 73 L.Ed.2d 149 (1982); In re Petroleum Products Litigation, 691 F.2d at 1339.
 
 1. Double Recovery
 
 14
 Shamrock argues that if the consumers are allowed to recover, there will be multiple recovery because Shamrock has already settled with and paid the grocery store class. Shamrock adds that the bulk of the grocery stores, representing two-thirds of its business, opted out of the class and the settlement and still may have claims against Shamrock. Shamrock argues that a plaintiff may not avoid Illinois Brick under any theory when a substantial risk of multiple recovery exists.
 
 
 15
 The consumers reply that the small size of the settlement relative to the settlements previously reached indicates that Shamrock's settlement with the grocery stores was nothing more than a nuisance value settlement. The consumers give figures that indicate that the grocery store settlement scarcely covered attorneys' fees. Further, the consumers argue that the settlement should have no effect on their suit based on a retail price-fixing conspiracy, particularly when the settlement agreement expressly preserved the consumers' suit.
 
 
 16
 We do not believe that there is a significant risk of double recovery in the present case of the type sought to be avoided by the Illinois Brick doctrine. The major concern in Illinois Brick was the risk of duplicative recovery by various members of the distribution chain for the same alleged overcharge. In the present case, however, the grocery store class settled for damages arising from a wholesale price-fixing conspiracy among the producers. The consumers no longer claim damages to themselves arising from an unlawful wholesale level conspiracy; they now rely solely on a damage theory based on a retail price-fixing conspiracy. If we accept the consumers' allegations of a retail price-fixing conspiracy as true, as we must on summary judgment, then we believe there is no danger of duplicative recovery if the consumers are allowed to sue for only that overcharge they prove resulted from a retail price-fixing conspiracy.
 
 2. Complex Damage Computation
 
 17
 The district court held that in light of the confused history of the present case, "[a]n accurate computation of damages by a jury hearing a consumers' claim ... would be a computational nightmare." Shamrock fleshes the argument out stating the problem as attempting "to sort out what portion of the retail price was caused by a wholesale conspiracy, what portion by a retail conspiracy, and what portion by other factors."
 
 
 18
 The consumers point out, however, that they have abandoned any attempt to prove a wholesale price-fixing conspiracy against Shamrock. Indeed, they offer to prove that there were no wholesale overcharges at all, thus removing at least one of the complicating factors. We believe that the concern in Illinois Brick was tracing a wholesale overcharge through an intermediary and allocating the retail price between an unlawful wholesale overcharge and market forces. These are not the concerns in the present case. Confronted with a similar situation, the court in In re Mid-Atlantic Toyota stated:
 
 
 19
 The principal of these policy factors, avoidance of tracing complexities, is inapposite when a dealer/distributor co-conspiracy is alleged. The injury suffered by the automobile purchasers through the effectuation of a voluntary co-conspiracy such as this can be determined by computing the retail price of a Toyota automobile but-for the alleged price fix, and subtracting that total from the actual purchase price. No other damage calculation would appear to be necessary on these allegations and no apportionment of passed-through overcharges is required. While such a calculation would appear to be a simple one, even if it is complex it would not be the type of complexity that the Illinois Brick Court was concerned with.
 
 
 20
 516 F.Supp. at 1295.
 
 
 21
 Thus, there is no need in the present case for the complicated allocation of an illegal overcharge sought to be avoided in Illinois Brick for the same reason that there is no risk of duplicative recovery. The consumers confine their claim for damages for dairy products purchased from grocery stores solely to that overcharge resulting from a retail level price-fixing conspiracy. There is no need to apportion that overcharge because it was not passed on to the consumers through any other level in the distribution chain. We hold that the policy considerations identified in Illinois Brick do not apply to the consumers' allegations of a conspiracy between the grocery stores and Shamrock to fix the retail price of those products. We must now address, however, whether the district court correctly concluded that the consumers are estopped from relying on such a conspiracy.
 
 B. Estoppel Theory
 
 22
 Shamrock points to three instances in which the consumers have altered their theory of recovery. In early 1978, the consumers argued an "umbrella" theory to avoid modification of its class certification on the basis of Illinois Brick.[3] Later that year the consumers argued a pass-on theory in support of the agreement allocating the fund from the settlement with the other defendants. The consumers did receive a large portion of that fund, but they justified such an allocation not only on the basis that the grocery stores passed on the overcharge but also because of their "assertions that certain grocery stores allegedly participated in the illegal activities." Finally in 1980, the consumers amended their complaint and for the first time specifically named the grocery stores as co-conspirators, retaining the original language regarding fixing retail prices. Their original complaint had alleged that the dairy producers fixed wholesale and retail prices with unnamed co-conspirators.
 
 
 23
 The consumers defend their actions on the ground that they were unaware, until after substantial discovery, what theory they could prove. The original general allegation of a retail conspiracy was never wholly abandoned by the consumers. They also argue that the theories they espoused are not in conflict; it is possible, they argue, to allege both retail and wholesale price-fixing conspiracies without conflict.
 
 
 24
 The district court focused on the settlements. It reasoned that the consumers benefitted from their pass-on theory in the allocation agreement and remained mute while Shamrock settled with the grocery stores insuring multiple liability if the consumers also recover. The district court held the consumers estopped from asserting the retail price-fixing theory. The court would have been correct if the same wholesale conspiracy was the basis for the consumers' present claim against Shamrock. As we have previously explained, however, the consumers now allege a separate retail conspiracy which was not the same as the wholesale conspiracy for which Shamrock settled with the grocery stores.
 
 
 25
 The issue of when a party may be estopped from relying on seemingly inconsistent theories or positions appears to be a matter of first impression in the Ninth Circuit. In Garcia v. Andrus, 692 F.2d 89 (9th Cir.1982), this court acknowledged that the doctrine of judicial estoppel acts to bar advancement of truly inconsistent positions but did not find it necessary to enumerate the requirements for application of the doctrine. 692 F.2d at 94. The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings." 1B Moore's Federal Practice p .405, at 767. One court has stated the rule:
 
 
 26
 A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention. Such use of inconsistent positions would most flagrantly exemplify that playing "fast and loose with the courts" which has been emphasized as an evil the courts should not tolerate. And this is more than affront to judicial dignity. For intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.
 
 
 27
 Scarano v. Central R. Co. of New Jersey, 203 F.2d 510, 513 (3d Cir.1953) (citations omitted); see also Konstantinidis v. Chen, 626 F.2d 933 (D.C.Cir.1980). The emphasis is not on a hard and fast rule, but rather on prevention of "intentional self-contradiction ... as a means of obtaining unfair advantage." Scarano, 203 F.2d at 513.
 
 
 28
 The consumers point out that this kind of estoppel
 
 
 29
 contemplates something other than the permissible practice, now freely allowed, of simultaneously advancing in the same action inconsistent claims or defenses which can then, under appropriate judicial control, be evaluated as such by the same tribunal, thus allowing an internally consistent final decision to be reached. See Fed.R.Civ.P. 8(e)(2).
 
 
 30
 Allen v. Zurich Ins. Co., 667 F.2d 1162, 1167 (4th Cir.1982); see also New Amsterdam Casualty Co. v. Waller, 323 F.2d 20, 24-25 (4th Cir.1963), cert. denied, 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1964). The consumers argue that the Federal Rules of Civil Procedure emphasize liberalized pleading and proof and that to apply estoppel here would be to return to the days when a claim of merit could be forfeited by a misstep on the procedural pathway.
 
 
 31
 In the present case we hold that the consumers are not estopped from proceeding with the litigation on a retail price-fixing conspiracy. The theories advanced by the consumers do not necessarily conflict in that the existence of a conspiracy at the wholesale level does not preclude the existence of an independent conspiracy at the retail level.
 
 
 32
 There is little of the "playing fast and loose" in the present case that the doctrine of judicial estoppel was intended to preclude. Rather, the consumer class was attempting to alter its theory of recovery in response to advanced discovery and to the change in the law brought about by Illinois Brick.[4] Although this is a close case, we hold that the consumers should be allowed to attempt proof of a retail price-fixing conspiracy.
 
 
 33
 Accordingly, the grant of summary judgment is reversed and the case is remanded to the district court for trial.
 
 
 34
 REVERSED and REMANDED.
 
 
 
 *
 Honorable William G. East, Senior District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 In Illinois Brick, the State of Illinois sued manufacturers and distributors of concrete block claiming that the manufacturers had engaged in a combination and conspiracy to fix prices. The block manufacturers sold the blocks to masonry contractors who used them in masonry structures that were in turn used in buildings by general contractors. The buildings were then sold to the state. Illinois Brick, 431 U.S. 426-27, 97 S.Ct. at 2064-65. The Supreme Court held that the State of Illinois was not an injured person under the antitrust laws. The Court relied on its earlier decision in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) as a basis for its decision. In Hanover Shoe, the Court held that an antitrust violator could not defend an antitrust suit by a direct purchaser on the basis that the purchaser has not been injured because it had passed on an illegal overcharge to its own customers. 392 U.S. at 494, 88 S.Ct. at 2234. Illinois Brick involved the offensive use of this pass-on theory; the Court reasoned that symmetry required a bar to the offensive use of the pass-on rationale by indirect purchasers in the distribution chain. 431 U.S. at 736, 97 S.Ct. at 2069
 
 
 [2]
 The Court mentioned two possible exceptions to the rule announced in Illinois Brick. First, the Illinois Brick rule does not apply where an indirect purchaser buys a predetermined quantity of goods subject to an illegal price-fixing arrangement from a direct purchaser operating under a "cost-plus" contract. Under such a contract, in setting the price at which to sell to indirect purchasers, the direct purchaser automatically adds a contractually predetermined sum to the price he paid the seller. Under these circumstances, "the pre-existing cost-plus contract makes easy the normally complicated task of demonstrating that the overcharge has not been absorbed by the direct purchaser." 431 U.S. at 732 n. 12, 97 S.Ct. at 2067 n. 12
 The second exception arises "where the direct purchaser is owned or controlled by its customer." 431 U.S. at 736 n. 16, 97 S.Ct. at 2070 n. 16. The Court recognized this cricumstance as one "in which market forces have been superseded." Id. Courts analyzing this exception have held that it also applies where the direct purchaser is owned or controlled by its supplier. See, e.g., In re Beef Industry Antitrust Litigation, 600 F.2d at 1160-61; Jewish Hospital Association v. Stewart Mechanical Enterprises, Inc., 628 F.2d 971, 974-75 (6th Cir.1980); Reiter v. Sonotone Corp., 486 F.Supp. 115, 121 n. 6 (D.Minn.1980); Dart Drug Corp. v. Corning Glass Works, 480 F.Supp. 1091, 1104 (D.Md.1979); see also Note, Scaling the Illinois Brick Wall, 63 Cornell L.Rev. 309, 327 (1978).
 
 
 [3]
 Under the umbrella theory, plaintiffs argue that the defendants' successful price-fixing conspiracy created a "price umbrella" allowing non-conspiring competitors of defendants to raise their prices to an artifically high level at or near the fixed price. Because the defendants allegedly are responsible for the market condition making this conduct possible, plaintiffs argue that the defendants should be liable not only for damages directly resulting from their alleged price-fixing activities, but also for damages resulting from their competitors' higher prices. The umbrella theory was later rejected as a means of avoiding Illinois Brick in In re Petroleum Litigation, 692 F.2d at 1338-41
 
 
 [4]
 Shamrock also argues that the law of the case doctrine would preclude the consumers' change of theory. That doctrine holds that in the interest of finality a court need not reopen that which it has already decided. See 1B Moore's Federal Practice p .404 (2d ed. 1982). In the present case, however, the trial court had made no prior determination concerning the consumers' theory of recovery. We do not believe law of the case may be predicated on the rulings approving the settlement agreements for the same reason that collateral estoppel does not apply to settlements. See 1B Moore's Federal Practice p .443, at 3917 (2d ed. 1982). The trial court decided nothing concerning the consumers' theories; it only decided that the settlements were fair and reasonable to the absent class members. See 3B Moore's Federal Practice p 23.40, at 23-519