JERSEY DENTAL LABORATORIES f/k/a Howard Hess Dental Laboratories Incorporated, and Philip Guttierez d/b/a Dentures Plus, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

DENTSPLY INTERNATIONAL, INC., and named dental dealers, Defendants.

No. CIV.A.01–267–SLR.

United States District Court, D. Delaware.

Dec. 19, 2001.

---

Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, and Beth Deborah Savitz, Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Thomas A. Dubbs, Esquire and Hollis L. Salzman, Esquire of Goodkind Labaton Rudoff & Sucharow LLP, New York, New York.

William D. Johnston, Esquire, John W. Shaw, Esquire, and Christian Douglas Wright, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendant Dentsply International, Inc. Of Counsel: Margaret M. Zwisler, Esquire, Richard A. Ripley, Esquire, Eric J. McCarthy, Esquire, and Courtney O. Taylor, Esquire of Howrey Simon Arnold & White, LLP, Washington, D.C., and Brian M. Addison, Esquire, Dentsply International, Inc., York, PA.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiffs Jersey Dental Laboratories f/k/a Howard Hess Dental Laboratories, Inc. ("Jersey Dental") and Philip Guttierez d/b/a Dentures Plus ("Dental Plus") filed an antitrust class action against defendants[1] on April 24, 2001 in this court. They allege that defendants conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; conspired to monopolize in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and conspired to restrain trade in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.[2] Plaintiffs seek

---

1. The defendants are Dentsply International, Inc.; A. Leventhal & Sons, Inc.; Accubite Dental Lab, Inc.; Addium Dental Products; Arnold Dental Supply Company; Atlanta Dental Supply Company; Benco Dental Company; Burkhart Dental Supply Company; Darby Dental Laboratory Supply Co., Inc.; Dental Supplies and Equipment, Inc.; Edentaldirect.com, Inc., as successor to Crutcher Dental, Inc.; Hendon Dental Supply, Inc.; Henry Schein, Inc., and its affiliates, including, without limitation, Zahn Dental Co., Inc.; Iowa Dental Supply Co.; Jahn Dental Supply Company; JB Dental Supply Co., Inc.; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc., a/k/a KDSC Liquidation Corp.; Marcus Dental Supply Co.; Midway Dental Supply Inc.; Mohawk Dental Co. Inc.; Nashville Dental, Inc.; Nowak Dental Supplies, Inc.; Patterson Dental Company, its subsidiaries, predecessors, successors, assigns, affiliates, and related companies; Pearson Dental Supplies, Inc.; Ryker Dental Supplies, Inc.; Thompson Dental Company.

2. Count I is against all defendants for conspiracy to restrain trade in violation of Section 1 of the Sherman Act (¶¶ 83–88); Count II is against Dentsply for monopolization in violation of Section 2 of the Sherman Act (¶¶ 89–95); Count III is against Dentsply for attempt to monopolize in violation of Section 2 of the Sherman Act (¶¶ 96–103); Count IV is against all defendants for conspiracy to monopolize in violation of Section 2 of the Sherman Act (¶¶ 30–113); Count V is against Dentsply for restraint of trade in Violation of Section 3 of the Clayton Act (¶¶ 31–119); Count VI is against all defendants for conspiracy to restrain trade in violation of Section 3 of the Clayton Act.

damages, equitable relief, and/or a declaratory judgment.

In the motion currently before the court, defendant Dentsply International, Inc. ("Dentsply") seeks to have the damages portion of the antitrust claims against it dismissed, because it alleges plaintiffs are indirect purchasers barred from recovering damages by *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Plaintiffs answer that *Illinois Brick* does not apply to their damage claims because the complaint names both the manufacturer (Dentsply) and the intermediate dealers ("dental dealers") as co-conspiring defendants, making plaintiffs ("dental laboratories") direct purchasers from the conspiracy.[3]

For the reasons that follow, the court shall grant Dentsply's motion to dismiss the damages claims against it.

## II. BACKGROUND

### A. The Parties

Plaintiffs Jersey Dental and Dentures Plus are dental laboratories that purchased Dentsply products, including Dentsply's "Trubyte" brand of artificial teeth, indirectly through the dental dealers. They bring this action on behalf of themselves and other similarly situated dental laboratories which have purchased and regularly purchase Dentsply's Trubyte brand of artificial teeth. According to the complaint, the class includes thousands of dental laboratories. (D.I. 1 at ¶¶ 2, 3)

Defendant Dentsply is a leading manufacturer and worldwide distributor of products and equipment for the dental market.

Through its Trubyte Division, Dentsply manufactures and markets products used by dental laboratories to make dentures and other removable dental prosthetics. (*Id.* at ¶ 4)

The remaining defendants are dental dealers that distribute Dentsply's products, including Trubyte brand teeth, through direct sales to dental laboratories. (*Id.* at ¶¶ 5–30) The dental dealers stock a "full array" of products needed to make dentures, including artificial teeth, and generally employ skilled sales and service people to provide services to dental laboratory customers. (*Id.* at ¶ 54)

### B. Related Litigation

This court granted summary judgment for defendant Dentsply on the damages issue in an earlier complaint filed by plaintiffs. In *United States v. Dentsply Int'l, Inc.,* No. 99–005–SLR, 99–255–SLR, 99–854–SLR, 2001 WL 624807 (D.Del. Mar. 30), plaintiffs named only the supplier, Dentsply, as defendant and not the intermediary dental dealers from which plaintiffs actually purchased artificial teeth. The court decided to dismiss plaintiffs' damages claims in part because the dental dealers/alleged co-conspirators were not joined as co-defendants. In response, plaintiffs filed the complaint that is the subject of this motion.

### C. Allegations in Current Complaint

The current complaint alleges that Dentsply and the dental dealers conspired to restrain trade and maintain a monopoly in violation of Sections 1 and 2 of the

---

**3.** In their brief opposing the motion, plaintiffs also raise several other arguments already rejected in a March 30, 2001 memorandum opinion granting summary judgment to Dentsply on a previous complaint. Plaintiffs re-argue that they buy some teeth directly from Dentsply under its drop-ship program, making plaintiffs direct purchasers for those specific purchases, and that Dentsply exerts sufficient control over its dealers to warrant application of the "control" exception to the indirect purchaser doctrine. Because the court fully addressed these issues in the earlier case, it declines to re-consider them here.

Sherman Act and Section 3 of the Clayton Act. Specifically, plaintiffs complain that restrictive dealing agreements between Dentsply and the dental dealers prevent competing artificial tooth manufacturers from effectively distributing their products and allow Dentsply to monopolize the relevant market for premium artificial teeth and maintain supracompetitive prices. (D.I. 1 at ¶¶ 69–76)

According to the complaint, Dentsply sells 80% of all artificial teeth used in the United States, with a market share of 89% for "premium" quality artificial teeth. Almost all artificial teeth sold in the United States are used by dental laboratories to make dentures. Dental laboratories distinguish among artificial teeth based on price and quality, and pay significantly higher prices for premium teeth. Dentsply manufactures artificial teeth, including premium quality teeth, and other merchandise used by dental laboratories in the production of dentures. It distributes and sells its products indirectly through the dental dealers named as defendants in this case. (*Id.* at ¶¶ 45–50) Dentsply's dealer network constitutes approximately 80% of the outlets in the United States distributing artificial teeth and other dental laboratory products. (*Id.* at ¶ 55)

Several companies compete with Dentsply in the manufacture and supply of artificial teeth. Two foreign manufacturers, Vita Zahnfabrik ("Vita") and Ivoclar AG ("Ivoclar"), successfully compete against Dentsply outside the United States, but account for less than 10% of total sales of artificial teeth in the United States. At least one domestic company, Austenal, Inc. ("Austenal"), manufactures a premium artificial tooth line which has sold well outside the United States, but which has not sold well within the United States, where only a small number of dealers carry the tooth line. Austenal has attempted, unsuc-

cessfully, to get additional dealers in the United States to distribute its teeth. (*Id.* at ¶¶ 51–53)

In 1993, Dentsply imposed conditions on its dealers for continuing to be or becoming Trubyte distributors. One condition requires that dealers "may not add further tooth lines to their product offering." (*Id.* at ¶ 62) This condition prevents dealers from adding competitors' tooth lines. Plaintiffs aver that the dental dealers "agreed and complied and continue to agree and comply with Dentsply's conditions" and "Dentsply entered into formal written agreements with certain of the Dealer Defendants to assure their partial or complete compliance with the . . . criteria." (*Id.*) Plaintiffs also claim Dentsply and the dental dealers conspired to restrict which dealers could carry Dentsply teeth. (*Id.*) Furthermore, Dentsply allegedly recruited new dealers it did not need on the condition that they either drop or not sell Vita and Ivoclar teeth. (*Id.* at ¶ 68)

As a penalty for "breaking off or withdrawing from this conspiracy," terminated dealers allegedly lose their ability to sell both Trubyte teeth and other Dentsply Trubyte merchandise. (*Id.* at ¶ 63) This may result in a significant loss of business for the dealers, because many dental laboratories use Dentsply teeth and other Trubyte merchandise and expect their dealers to have the Trubyte product line available. (*Id.* at ¶¶ 64–65) Plaintiffs claim that no dealer defendant has successfully added a new, competitive tooth line since 1987. (*Id.* at ¶ 66)

The complaint also describes two specific incidents where Dentsply required exclusive dealing in return for giving dental dealers the right to distribute Dentsply teeth. In one alleged incident, Dentsply terminated its relationship with a dental dealer because it began carrying a competitor's tooth product line in addition to

Dentsply's "Trubyte" product line; that dealer eventually agreed to cease distribution of the competitor's teeth in exchange for reinstatement of its relationship with Dentsply. (*Id.* at ¶ 60) In another alleged incident, Dentsply offered a non-Trubyte dealer the opportunity to become a Trubyte dealer if it agreed not to carry a competitor's product line anymore; the dealer agreed to the terms. Until Dentsply learned the dealer was selling the particular competitor's products, Dentsply had rejected requests from the same dealer to carry Dentsply teeth. (*Id.* at ¶ 61)

Plaintiffs claim injury "in their business and property as a result of the conduct alleged herein, including having paid artificially high prices for artificial teeth...." (*Id.* at ¶ 82) On each count of the complaint, plaintiffs aver that as a result of defendants' violation of the antitrust statutes, they are unable to purchase artificial teeth at prices determined by free and open competition and are damaged by their respective purchases of artificial teeth at prices higher than they would have otherwise paid. (*Id.* at ¶¶ 86, 92, 100, 110, 117, 126)

During oral argument on this motion, plaintiffs also alleged a retail price-fixing conspiracy: "Here, the wholesalers, the dealers, and the manufacturer, Dentsply, have agreed as to what the pricing will be." (D.I. 146 at 34) Plaintiffs cited ¶ 39 of the complaint as support for this argument: "Plaintiffs and all other members of the Class made purchases of Dentsply artificial teeth either directly or indirectly from Dentsply through the Dealer Defendants, at artificially maintained, non-competitive prices **established by Dentsply** and sold by Defendants to the Class." (D.I. 1 at ¶ 39) (emphasis added). In their answering brief, plaintiffs claim that "the dealers agreed to charge Plaintiffs prices set by Dentsply." (D.I. 93 at 7) They explain that "Dentsply sets a suggested retail price," and for a dealer to sell at a price below the suggested price, a "price deviation must be approved by [Dentsply management]." (*Id.* at 9) At oral argument, Dentsply countered that "the price deviation forms do not mean that Dentsply is giving permission to the dealer to charge a lower price. It means that Dentsply is getting permission from its Chief Financial Officer and the General Manager of the division to lower the list price to the dealer to permit the dealer to compete." (D.I. 146 at 16) Dentsply characterized these as "Robinson–Patman Act forms." (*Id.* at 15)

## III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "When deciding a motion to dismiss, it is the usual practice for a court to consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir.1998). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991).

## IV. DISCUSSION

The "indirect purchaser" rule announced in *Illinois Brick* bars indirect purchasers from recovering treble damages in an antitrust suit. In defending against defendant's motion to dismiss, plaintiffs ask the court to adopt a "co-conspirator" exception to the indirect purchaser rule.

### A. Legal Standards

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Although the Clayton Act provides relief to anyone injured, the Supreme Court limited the scope of injured plaintiffs in *Illinois Brick*.

In *Illinois Brick*, plaintiffs were indirect purchasers of concrete block. Plaintiffs sued concrete block manufacturers under § 4 of the Clayton Act for an alleged price-fixing conspiracy. Plaintiffs alleged that defendant concrete block manufacturers conspired to overcharge masonry contractors, who passed on the overcharges to general contractors, who passed on the overcharges to plaintiffs, who purchased buildings made from concrete block.

The issue before the Supreme Court was whether indirect purchaser plaintiffs could use the "pass on" theory to state a damage claim against an alleged antitrust violator. To maintain consistency with its decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which barred defensive use of the "pass-on" theory, the *Illinois Brick* Court held that antitrust plaintiffs could not claim an injury resulting from overcharges passed on to them through those who purchased directly from the defendant. 431 U.S. at 724–26, 735, 97 S.Ct. 2061. The Court gave three reasons why the *Hanover Shoe* rule should apply to both plaintiffs and defendants. First, symmetry was necessary to avoid multiple liability. Without symmetry, both the brick masons and the state could sue the defendants and recover the full amount of the overcharge. *Id.* at 730, 97 S.Ct. 2061. The Court expressed concern that, even if all potential plaintiffs could be joined in "one huge action" to avoid duplicative recovery, the complexity introduced to the proceedings "argues strongly for retaining the *Hanover Shoe* rule." *Id.* at 731 n. 11, 97 S.Ct. 2061. Second, the Court was concerned that judicial analysis of pass-on arguments would increase the complexity of antitrust litigation and "greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings." *Id.* at 731–32, 97 S.Ct. 2061. Finally, the majority "conclude[d] that the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws . . . is better served" by concentrating all damages recovery in the hands of the direct purchaser. *Id.* at 746, 97 S.Ct. 2061. The Court recognized that "direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers," but still concluded that adhering to the indirect purchaser rule would best encourage vigorous private enforcement of the antitrust laws. *Id.* at 746, 97 S.Ct. 2061.

In *Illinois Brick*, the Supreme Court contemplated two exceptions to the indirect purchaser rule: (1) where the indirect purchaser acquired goods through a preexisting cost-plus contract; and (2) "where the direct purchaser is owned or controlled by its customer." *Id.* at 736 & n. 16, 97 S.Ct. 2061.

Since *Illinois Brick*, the Court has issued two notable opinions regarding antitrust standing. In *Associated General Contractors v. California State Council of*

*Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)("*AGC*"), the Supreme Court synthesized its previous rulings on antitrust standing and considered five factors in resolving standing issues: (1) the causal connection between the antitrust violation and the harm to the plaintiff; (2) whether the antitrust injury is of the type that the antitrust statute was intended to forestall; (3) the directness or indirectness of the asserted injury; (4) the existence of more direct victims of the alleged violation; and (5) the potential for duplicative recovery or complex apportionment of damages. *Id.* at 537–45, 103 S.Ct. 897.

In *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir.1996), the Third Circuit discussed the relationship between the multi-factor standing analysis articulated in *AGC* and the Supreme Court's earlier holdings in *Illinois Brick.* "[F]actors four and five in the *AGC* framework echo *Illinois Brick*'s concerns. In our view, *AGC* incorporates, rather than repudiates, the principles of *Illinois Brick.*" *Id.* at 850–1. The court explained that *AGC* was concerned primarily with whether a particular plaintiff's injury was too remote from an antitrust injury to provide a damages remedy, whereas "*Illinois Brick* dealt with the issue of whether a plaintiff who is able to trace an injury to an antitrust violation falls within the group of private attorneys general that Congress created to enforce the antitrust laws." *Id.* at 851 n. 14 (internal quotes omitted).

In the latest Supreme Court decision addressing the indirect purchaser rule, the Court expressed great reluctance to create

any new exceptions to *Illinois Brick. Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). There, state attorneys general representing residential users of natural gas sued various producers of natural gas who allegedly conspired to fix prices. The indirect purchaser plaintiffs argued that *Illinois Brick* did not apply because the concerns regarding risk of multiple recovery and difficulty in apportionment would not be implicated where the regulated utilities that were the direct purchasers passed on one hundred per cent of their costs to customers. *Id.* at 208, 110 S.Ct. 2807. The Court rejected the plaintiffs' theory, holding that the absence of a particular *Illinois Brick* predicate in an individual case does not change the bar against indirect purchaser suits. "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217, 110 S.Ct. 2807. Among other concerns, the Court was "unconvinced that the exception sought by the petitioners would promote antitrust enforcement better than the current *Illinois Brick* rule." *Id.* at 216, 110 S.Ct. 2807. The Court expressed willingness to consider new exceptions to the indirect purchaser rule only when "the direct purchaser will bear no portion of the overcharge and **otherwise suffer no injury.**" *Id.* at 218, 110 S.Ct. 2807 (emphasis added).

Although several lower courts have recognized a "co-conspirator exception" to *Illinois Brick,*[4] the Third Circuit has never

---

4. *See, e.g., Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir.1984) (refusing to apply *Illinois Brick* against indirect purchaser in a vertical retail price-fixing scheme); *In re Brand Name Prescription Drugs Antitrust Litigation*, 867 F.Supp. 1338 (N.D.Ill.1994) ("Brand Name") (finding *Illinois Brick* did

not apply where intermediate co-conspirators were named as co-defendants), *rev'd on other grounds*, 123 F.3d 599 (7th Cir.1997); *In re Mid–Atlantic Toyota Antitrust Litigation*, 516 F.Supp. 1287 (D.Md.1981) (allowing suit by indirect purchaser where intermediate co-conspirator dealers were voluntary and equal

expressly adopted the exception. In *McCarthy*, for example, former patients sued hospitals and copy service companies for copying costs incurred by plaintiffs' attorneys. The plaintiffs alleged that the hospitals and copy services conspired to charge excessive prices to copy patient records sought by attorneys on plaintiffs' behalf. The Third Circuit rejected plaintiffs' co-conspirator exception argument in part because plaintiffs had not alleged that the attorneys who actually paid for the copies were co-conspirators and had not joined them as defendants. The Third Circuit instead affirmed the lower court's grant of summary judgment, relying on *Illinois Brick*. *McCarthy*, 80 F.3d at 854–55.

The *McCarthy* court relied on several Third Circuit cases in refusing to apply a "co-conspirator exception." For example, in *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958 (3d. Cir.1983), the Third Circuit held that *Illinois Brick* applied to indirect purchasers who allegedly were the "direct target[s]" of a vertical antitrust conspiracy. *Id.* at 962. In that case, plaintiffs were non-factory authorized dealers who purchased electrical generators from a factory authorized dealer and then re-sold the generators in foreign markets. Plaintiffs complained that the manufacturer imposed a nonrefundable 5% "warranty service fee" on all sales by authorized dealers when installed outside of the authorized dealer's assigned service territory, thus hindering competition. Rather than applying the *AGC* balancing test, the court found that the correct inquiry was to determine, in light of the policies underlying *Illinois Brick*, whether plaintiffs were "in the group of private attorneys general created by Congress to redress [defendant's]

assumed antitrust violation through use of the treble damage remedy." *Id.* at 966. To determine if particular plaintiffs were in the class of "private attorneys general," the court needed to examine "whether allowing those persons to sue could create the possibility of duplicative recovery and overly-complex damage claims." *Id.* at 968. The Third Circuit found the factory authorized dealers could make a claim against the manufacturer for lost profits and, if they did, "[they] would be claiming treble damages for injuries arising from the very same transactions involved in this case," thus risking duplicative recovery. *Id.* at 969.

In *Link v. Mercedes–Benz of North America, Inc.*, 788 F.2d 918 (3d Cir.1986), plaintiffs, Mercedes owners, sued Mercedes–Benz and various wholly owned subsidiaries for allegedly conspiring to fix the rates of non-warranty repair parts and services on Mercedes–Benz automobiles. Plaintiffs named Mercedes-authorized dealers from whom they had purchased parts and services as co-conspirators, but did not name them as co-defendants. In concluding that the co-conspirator exception would subject Mercedes to the risk of multiple liability through suits filed by the dealers, the court recognized that plaintiffs' theory of damages included injury to the intermediate dealers on which an antitrust claim could be based, at the very least "in the form of decreased profit margins." *Id.* at 932 n. 12.

The *Link* court also rejected plaintiffs' arguments that the doctrine of *in pari dilecto* provided Mercedes with a defense to any dealer suit and eliminated risk of duplicative recoveries. *Id.* at 932. The court opined that Mercedes would still be subject to the risk of lawsuits filed by

partners in the conspiracy, thereby foreclosing suit by dealers against car part distributors).

intermediate dealers because the dealers' involvement in the alleged conspiracy fell short of the "complete involvement" needed to trigger an *in pari dilecto* defense. *Id.* (citing *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)).

In *Perma Life*, dealers who had operated "Midas Muffler Shops" alleged that Midas conspired with its subsidiaries and other individuals to violate § 1 of the Sherman Act and § 3 of the Clayton Act. Among other things, the sales agreements between Midas and the dealers required the dealers to purchase all their mufflers and exhaust system parts from Midas, carry the complete line of Midas products, and sell the mufflers at retail prices fixed by Midas. Plaintiff dealers also alleged threats of termination for failure to comply with the agreements. While the *Perma Life* Court acknowledged that plaintiffs "may be subject to some criticism for having taken any part in [defendants'] allegedly illegal scheme and for eagerly seeking more franchises and more profits," the Court concluded "their participation was not voluntary in any meaningful sense." 392 U.S. at 139, 88 S.Ct. 1981. "[Plaintiffs] apparently accepted many of [the agreements'] restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity." *Id.* at 139, 88 S.Ct. 1981. The Court held that the doctrine of *in pari delicto*, which means "of equal fault," could

not be used as a defense to an antitrust action. *Id.* at 140, 88 S.Ct. 1981. The only exception to the bar on the *in pari delicto* defense contemplated by the Court involves the situation where the "co-conspirators" actively support the illegal restrictions through participation in their formulation and encouragement of their continuation, thereby showing "truly complete involvement and participation in [the] monopolistic scheme."[5] *Id.* at 140, 88 S.Ct. 1981. *See also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 308, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (reconciling separate opinions in *Perma Life*) (an alleged co-conspirator must bear "at least substantially equal responsibility" for the injury for the *in pari delicto* defense to be available).

## B. Analysis

In asking this court to dismiss the complaint, defendant argues that the Third Circuit has never recognized the "co-conspirator" exception to *Illinois Brick*, so the indirect purchaser rule must bar plaintiffs here. Defendant further argues that, even if a "co-conspirator" exception were to be recognized by this court, it would have to be limited to vertical retail price-fixing conspiracies.[6]

Plaintiffs respond that they have satisfied *McCarthy* by naming the intermediate dealers as co-defendants, thereby removing the risk of duplicative recovery. They

---

**5.** Even where courts in other circuits have recognized a "co-conspirator" exception to *Illinois Brick*, the voluntary and equal involvement of intermediate co-conspirators has been required. *See, e.g., Dee–K Enterprises, Inc. v. Heveafil Sdn. Bhd.*, 982 F.Supp. 1138, 1153 & n. 8 (E.D.Va.1997); *In re Brand Name Prescription Drugs Antitrust Litigation*, 867 F.Supp. 1338, 1345 (N.D.Ill.1994); *In re Mid–Atlantic Toyota Antitrust Litigation*, 516 F.Supp. 1287, 1295–6 (D.Md.1981).

**6.** Defendant also asserts that plaintiffs' conspiracy claim is deficient as a matter of law, because it alleges only unilateral activities on the part of Dentsply, whereas statement of a manufacturer-dealer antitrust conspiracy under the Sherman Act requires allegations of concerted action between two or more co-conspirators. The court disposes of this motion on other grounds and, therefore, need not address whether the complaint sufficiently pleads an antitrust conspiracy.

also argue that no complex damage allocation issues are raised here because Dentsply and the dealers have conspired to fix retail prices paid by plaintiffs; as a result, all overcharge damages are incurred by plaintiffs.

The first policy concern expressed in *Illinois Brick* is that indirect purchaser lawsuits will result in duplicative recovery of antitrust damages. Although plaintiffs have named the intermediate co-conspirators as defendants here,[7] this does not prevent the dental dealers from filing their own lawsuits against Dentsply. As the Third Circuit recognized in *Link*, the Supreme Court has decided that vigorous enforcement of the antitrust laws requires that co-conspirators in an antitrust conspiracy be allowed to sue fellow conspirators, as long as the complainants do not share substantially equal responsibility for the violations.

As in *Link* and *Perma Life*, the intermediate "co-conspirators" here are the parties most directly harmed by Dentsply's alleged anticompetitive tactics. Plaintiffs do not deny this. In fact, the complaint alleges with particularity the harm to dental dealers who fail to comply with Dentsply's requirement that they not carry competitors' tooth lines: termination as a Dentsply dealer, and probable loss of den-

tal laboratory customers. The complaint also alleges that Dentsply establishes the prices for Trubyte teeth, and that the dental dealers merely agree to sell at those prices. Nowhere in the complaint are the dental dealers accused of instigating any anticompetitive activities. In addition, the complaint alleges that Dentsply used coercive tactics to get the dental dealers to participate in the anticompetitive practices it had initiated. The court finds no way to construe the facts alleged such that the dental dealers could be considered "substantially equal" participants in the alleged conspiracy, *Bateman Eichler*, 472 U.S. at 308, 105 S.Ct. 2622, or that their participation was "voluntary in any meaningful sense," *Perma Life*, 392 U.S. at 139, 88 S.Ct. 1981. As a result, under the facts alleged, Dentsply cannot raise the *in pari delicto* defense against a dental dealer lawsuit.[8]

The second policy concern underlying *Illinois Brick* is that indirect purchaser lawsuits will result in overly complex and protracted damages proceedings. Plaintiffs at bar contend that no complex damage apportionment would occur in this case because the overcharge claimed by plaintiffs occurred only in the price paid at the retail level, eliminating any need to appor-

---

7. Defendant argues that plaintiffs have not named all Dentsply dealers as co-defendants and, therefore, fail to meet the requirements articulated in *McCarthy*. Plaintiffs aver that they have named all dealers they were aware of and will move to amend the complaint as needed to add additional dealers that Dentsply identifies. In addition, three defendants have filed separate motions to dismiss based on covenants not to sue; these defendants entered into the covenants with plaintiffs in conjunction with the first complaint filed against Dentsply. (D.I.106, 122, 133)

8. In a follow-up letter to the oral argument on this motion, plaintiffs argue that the court should allow this lawsuit to go forward, and if

the dental dealers are found liable for antitrust damages as co-conspirators, the dealers will be prevented from suing Dentsply because there is no right to contribution under antitrust laws. (D.I.152) While the dental dealers might be prevented from suing for contribution on damages owed to the dental laboratories, they could still sue to recover any damages they had incurred directly due to Dentsply's alleged antitrust violations. In *Link*, the Third Circuit implicitly recognized that only where co-conspirators have "truly complete involvement" in the conspiracy, under *Perma Life*, would this prevent them from later suing their co-defendants. *Link*, 788 F.2d at 932.

tion damages between direct and indirect purchasers.

Although the court is not convinced that the complaint alleges a retail price fixing scheme, even if it did, this would not take plaintiffs outside of *Illinois Brick*. The most recent Supreme Court pronouncement on the indirect purchaser rule, in *UtiliCorp*, made it clear that simply alleging no overcharge injury to an intermediate dealer does not create an exception to the indirect purchaser rule. While the Court in *UtiliCorp* expressed some willingness to consider an exception where it could be proven that the direct purchaser bore **none** of the overcharge, it also required that the direct purchaser not suffer **any other injury**. The result of *UtiliCorp* reveals how difficult it would be to convince the Court that a direct purchaser bore none of the overcharge. Even where state law allowed 100% pass-through of the direct purchasers' cost to the end consumers, the Court found the potential for complex apportionment problems.

Here, the complaint does not allege that "supracompetitive" prices occurred only at the retail level; instead, it alleges that the restrictive dealing and monopoly position of Dentsply allowed Dentsply to establish and maintain supracompetitive prices. Even if the dental dealers expressly agreed to sell Dentsply's teeth at supracompetitive retail prices, the dealers still may have suffered harm from supracompetitive wholesale prices or from their potential lost profits on sales of greater quantities of lower priced Dentsply teeth

or sales of competitors' teeth. In short, the difficulties of damage apportionment between direct and indirect purchasers are still present in this case.

The third major policy consideration of *Illinois Brick* is that concentration of all damages recovery in the hands of the direct purchaser will best serve the legislative purpose to enforce the antitrust laws through a group of "private attorneys' general." *Illinois Brick*, 431 U.S. at 746, 97 S.Ct. 2061. The Supreme Court reinforced this concern in *UtiliCorp*, when it stated that its interpretation of § 4 of the Clayton Act "must promote the vigorous enforcement of the antitrust laws." *UtiliCorp*, 497 U.S. at 214, 110 S.Ct. 2807. Allowing plaintiffs at bar to maintain their lawsuit would not satisfy the Court's concerns about vigorous enforcement. Plaintiffs assert that "thousands" of indirect purchaser dental laboratories exist. This raises the exact concern expressed by the Supreme Court that diluting recovery among too many parties would reduce the incentive for any one party to bring suit. In addition, there is no indication that the direct purchasers here will not bring suit. Even if they do not, the bright-line rule of *Illinois Brick* still applies. The Supreme Court concluded in both *Illinois Brick* and *UtiliCorp* that the indirect purchaser rule best encourages vigorous private enforcement of the antitrust laws, even if some direct purchasers refrain from bringing treble-damages suits for fear of disrupting relations with their suppliers.[9]

---

**9.** Plaintiffs try to remove themselves from *Illinois Brick* by articulating an alternate damage theory in their brief and on oral argument. However, in the complaint, plaintiffs claim the injuries they suffered are the supracompetitive prices they paid to purchase Dentsply teeth from the intermediate dental dealers. This is an overcharge claim, and plaintiffs cannot extricate themselves from their indirect purchaser status by re-naming their injuries to ones for lost profits. (D.I. 146 at 28). The intermediate dental dealers suffer the direct harm from any lost opportunity to sell a greater volume of Dentsply products or to sell competitive product lines and profit therefrom. Any harm suffered by plaintiffs remains indirect.

Based on the above discussion, the court concludes that the indirect purchaser rule still applies to plaintiffs here, despite plaintiffs having named, or attempted to name, all alleged co-conspirators as co-defendants. The Third Circuit has never recognized a "co-conspirator" exception to *Illinois Brick*, and this court finds that all three policy concerns underlying *Illinois Brick* are still implicated in this lawsuit. As a result, plaintiffs do not fall within the group of private attorneys general that Congress created to redress defendant's assumed antitrust violation through use of the treble damage remedy.

## V. CONCLUSION

After considering the complaint and the parties' arguments, the court concludes that plaintiffs are classic indirect purchasers who are barred from seeking damages by *Illinois Brick*. No co-conspirator exception has been recognized by the Third Circuit, and this court finds no compelling reason to create one here. As a result, the court shall grant Dentsply's motion to dismiss. An appropriate order shall issue.

### ORDER

At Wilmington, this 19th day of December, 2001, consistent with the memorandum opinion issued this same day,

IT IS ORDERED that defendant Dentsply International, Inc.'s motion to dismiss (D.I.74) shall be granted. All claims for damages against defendant are dismissed.